UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
MICAH A. SALISBURY,
                                        :
            Plaintiff,                          **REPORT & RECOMMENDATION**
                                        :
      -against-                                  **13cv2805 (VEC) (MHD)**
                                        :
CAROLYN W. COLVIN, Acting
Commission of Social Security,          :

            Defendant.                  :
--------------------------------x

TO THE VALERIE E. CAPRONI, U.S.D.J.:


      Plaintiff  Micah  A.  Salisbury  brings  this  lawsuit  under

section 205(g) of the Social Security Act (the "Act"), as amended,

42  U.S.C.  §  405(g),  seeking  judicial  review  of  the  Acting

Commissioner's  decision  denying  his  application  for  Social

Security disability benefits. He premises his disability claim on

physical  and  mental  impairments  arising  primarily  from  an

automobile accident that took place in March 2008.


      Both parties have moved for judgment on the pleadings. (Docket

nos. 13 & 19). Mr. Salisbury seeks an order reversing the Acting

Commissioner's  determination  and  remanding  for  a  calculation  of

benefits  only  or,  in  the  alternative,  an  order  of  remand  for

further  development  of  the  record.  The  Acting  Commissioner

("Commissioner")  seeks  affirmance  of  her  final  decision.  For  the

reasons that follow, we recommend that the case be remanded for development of the record, as indicated below.

**BACKGROUND**

I.   Procedural History

Mr. Salisbury filed for disability insurance benefits on January 6, 2009. (Tr. 40, 120). In one of plaintiff's early submissions to the Social Security Administration ("SSA"), he alleged, inter alia, an inability to "lift, stand, walk, sit, climb stairs, kneel, squat or reach for any length of time because I experience immediate pain and discomfort." (Id. at 610). Plaintiff stated that this pain originated on March 3, 2008 and also generally described certain emotional and mental impairments stemming from depression. (Id. at 610, 613).

On initial review of his application, the SSA denied plaintiff's request for benefits on April 30, 2009. (Id. at 120, 146-57). On June 10, 2009, Mr. Salibury requested an administrative hearing to review this adverse determination. (Id. at 158-59).

Administrative Law Judge ("ALJ") Dennis G. Katz conducted a hearing on July 28, 2010, at which Mr. Salibury, represented by

counsel, testified on his own behalf. (<u>Id.</u> at 95-119). On September 16, 2010, the ALJ issued a decision, determining that plaintiff was not disabled. (<u>Id.</u> at 121-36). Plaintiff then appealed to the Appeals Council (<u>id.</u> at 195-209), which, on July 18, 2011, vacated the ALJ's decision and remanded the case back to him for further review. (<u>Id.</u> at 137-40).

The Appeals Council specifically found two faults with the ALJ's decision. (<u>Id.</u>). First, ALJ Katz had given "greater evidentiary weight" to two doctors "whose opinions were expressed in more narrative format, as opposed to the 'check-off' format employed by Dr. Mehar[1] -- who [has] not explained the basis for evaluations -- particularly his inconsistent evaluations of the claimant's ability to perform sedentary activities." (<u>Id.</u> at 130). The Appeals Council, however, gleaned "no indication that the Administrative Law Judge attempted to re-contact Dr. Gurinder S. Mehar to request clarification," stating that "further development is necessary." (<u>Id.</u> at 138).

Second, the Appeals Council noted that the record contains "two medical source opinions dated April 16, 2008 and April 30,

---

[1] Dr. Gurinder S. Mehar was plaintiff's primary care physician before, during, and after the relevant period. <u>See</u> <u>infra</u> pp. 43-46.

2008 by Scott M. Levin, M.D.,[2] indicating that the claimant 'is out of work until further notice.'" (Id. at 138 (quoting id. at 648-49, 652)). The ALJ's opinion, however, had "not discuss[ed] the[se] opinions. Therefore, further evaluation is warranted." (Id. at 138).

Accordingly, the Appeals Council gave a number of instructions to the ALJ upon remand. (Id. at 138-39). First, the ALJ was to "[r]e-contact the claimant's physicians for clarification of medical source opinions, as necessary." (Id. at 138). Second, the ALJ was instructed to "[g]ive further consideration to the claimant's maximum residual functional capacity ["RFC"] during the entire period at issue and provide rationale with specific references to evidence of record in support of asserted limitations." (Id. at 138-39). In so doing, the Appeals Council stated that "[a]s appropriate, the Administrative Law Judge may request the treating and nontreating sources to provide additional evidence and/or further clarification of the opinions and medical source statements about what the claimant can still do despite the impairments." (Id. at 139). Finally, the Appeals Council explained that, "[i]f warranted by the expanded record, [the ALJ will] obtain evidence from a vocational expert to clarify

---

[2] Dr. Levin was an orthopedic physician from whom plaintiff sought treatment for his back injuries. See infra pp. 32-36.

the effect of the assessed limitations on the claimant's occupational base." (Id.).

Shortly thereafter, on July 22, 2011, the SSA provided plaintiff with a notice informing him that another hearing would take place before the ALJ (id. at 210-18), which was subsequently scheduled for November 16, 2011. (Id. at 223-53).

ALJ Katz indeed held this second hearing, at which both plaintiff and Darren Flomberg,[3] a vocational expert, testified. (Id. at 60-94). On January 17, 2012, the ALJ issued another opinion, again determining that plaintiff was not disabled. (Id. at 37-59). On February 9, 2012, plaintiff appealed this decision to the Appeals Council (id. at 12; see also id. at 7-11), which proceeded to deny review on February 28, 2013, rendering the ALJ's decision final. (Id. at 1-6).[4]

---

[3] The transcript of this hearing erroneously spells the vocational expert's name as both Darren "Flemberg" (Tr. 62) and Darren "Flumberg" (id. at 80), although the expert's resume, also provided in the record, reveals that his name is actually Darren Flomberg. (See id. at 219-222).

[4] We note that, somewhat strangely, contained on pages 13-36 of the administrative record are a number of notices -- dated both to two days after the ALJ's second decision and four days before that decision, indicating that a third hearing had been scheduled. (See Tr. 13-36). This hearing was to take place on March 28, 2012, at which another vocational expert, Donald R. Slive, was requested to testify. (Id. at 13, 20, 35). No transcript of this hearing is included in the record and neither party makes reference to it in their briefs. Accordingly, we presume that it was erroneously scheduled, never took place, or is in any event inapposite to the litigation before us -- which fundamentally concerns the legal sufficiency of the ALJ's January 17, 2012 decision.

II.   The Pertinent Record

a. Introductory Factual Background

Micah Salisbury was born on July 1, 1971. (Id. at 653). A self-employed landscaper at the time of his accident (id. at 640), he has a wife and three children, with whom he resides. (Id. at 64-65).

Shortly after noon on March 3, 2008, when plaintiff was thirty-six years old, he arrived via ambulance at the Emergency Room ("ER") of St. Luke's Cornwall Hospital. (Id. at 98, 653). Plaintiff had been in a motor vehicle accident, in which his car was rear-ended while he was stopped (id. at 654), apparently waiting for a school bus. (Id. at 98, 830). Plaintiff explained to the hospital intake staff that he was unsure how fast the other vehicle had been driving or whether he had lost consciousness (id. at 654), although on a later occasion, he indeed recalled having blacked out. (Id. at 830).[5]

---

[5] As of the time of the first hearing, plaintiff had commenced a lawsuit against the individual who had rear-ended his car. (Tr. 115). Plaintiff's own insurance carrier, for purposes of assessing a no-fault claim, conducted an Independent Medical Examination ("IME") (see id.), for which Dr. Sunitha Polepalle examined plaintiff and produced a report. (See id. at 668-72). See also infra pp. 54-56.

b. <u>Testimony at Hearings Before the ALJ</u>

i. <u>Hearing on July 28, 2010</u>

As mentioned, Mr. Salisbury twice testified before ALJ Katz. (<u>Id.</u> at 60-119). At the initial hearing, held on July 28, 2010, the ALJ first observed that Mr. Salisbury was using a cane, which plaintiff explained had been prescribed eight months prior in response to worsening pain. (<u>Id.</u> at 98-99). Acknowledging that he had not earlier experienced this type or degree of pain, plaintiff explained that the cane was provided after he had "started getting radiating and shooting pains . . . [t]o my legs and up the back of my neck into my head." (<u>Id.</u> at 98-99). Plaintiff characterized the change in pain as "[j]ust a progression." (<u>Id.</u> at 99).

In contrast, plaintiff testified that -- in the immediate aftermath of the accident, at the time he began treatment with Dr. Syed Hosain, his pain management doctor -- his pain was generally relegated to his lower back. (<u>Id.</u> at 106). Plaintiff stated that, at that time, if he "sat for more than 15 or 20 minutes it would start to make my legs numb and the longer I sat . . . the worse the pain would get." (<u>Id.</u>). Similarly he was (and remained, as of the hearing) unable to stand for more than 15 to 20 minutes at a time. (<u>Id.</u> at 106-07).

In addition to testifying about his physical pain, plaintiff also addressed his psychiatric care. (Id. at 110-14). Plaintiff asserted that he had been diagnosed with depression in the wake of the death of his father and the loss of a job[6] and that he had taken Wellbutrin[7] from approximately 2004, to positive effect. (Id. at 111). He also acknowledged that he did not begin treatment with Dr. Todd Rochman -- affiliated with East Orange Psychiatric Associates, LLP -- until the spring of 2009. (Id. at 110-11).[8] At the time of the first hearing, plaintiff was still undergoing treatment for depression, taking Abilify[9] and Zoloft.[10] (Id. at 112).

Following this testimony, ALJ Katz asked whether plaintiff was "claiming a mental illness as another reason for not being

---

[6] At the first hearing, plaintiff did not mention an onset date of his depression or of the asserted diagnosis (see Tr. 111); however, in a related discussion at the second hearing, plaintiff provided an approximate timeframe, stating that these events took place circa 2000 or 2001. (Id. at 67-68).

[7] Bupropion, branded as Wellbutrin, "[t]reats depression and aids in quitting smoking. Also prevents depression caused by seasonal affective disorder (SAD)." BUPROPION, U.S. NAT'L LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009361/?report=details (last visited Aug. 5, 2015).

[8] For records from Dr. Rochman's office, see infra pp. 46-53.

[9] Aripiprazole, branded as Abilify, "[t]reats schizophrenia, bipolar disorder, depression, and Tourette syndrome." ARIPIPRAZOLE, U.S. NAT'L LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009101/?report=details (last visited Aug. 14, 2015).

[10] Sertraline, branded as Zoloft, "[t]reats depression, obsessive-compulsive disorder (OCD), posttraumatic stress disorder (PTSD), premenstrual dysphoric disorder (PMDD), social anxiety disorder, and panic disorder. This medicine is an SSRI." SERTRALINE, U.S. NAT'L LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012108/ (last visited Aug. 14, 2015).

able to work." (Id. at 112-13). Plaintiff answered in the affirmative, explaining that his mental illness prevented him from working because "I can't concentrate. On bad days I get withdrawn and I don't want to talk to anybody. And it's debilitating to me. I can't provide for my family." (Id. at 113). Plaintiff explained that he visits with a social worker every two or three weeks at East Orange Psychiatric for "the verbal" portion of his treatment, while Dr. Rochman, whom he sees approximately once a month, "adjusts my meds." (Id. at 114).

Plaintiff testified that he was also taking Ambien, a sleep aid. (Id. at 112-13). Plaintiff stated that, without the Ambien, "I don't sleep at all." (Id. at 113). With the medication, however, he gets "about three or four hours straight of sleep and then I[] probably wake up every 45 minutes cause I'm in pain and I have to rotate." (Id.). Plaintiff further clarified that, but for the Ambien, the pain would entirely prevent him from sleeping. (Id.). Plaintiff suggested that, given his difficulty sleeping at night, he suffers from "chronic fatigue" during the day. (Id. at 113-14).

Plaintiff also testified at some length about his employment status and history, beginning with a description of the landscaping business that he had been involved in prior to the automobile

accident. (Id. at 99-103, 116-18).[11] At that time, he was self-
employed as a landscaper for Firthcliffe Residential Services --
a business he co-owned with his wife -- working six to eight hours
a day, five to six days a week. (Id. at 99-100, 102). Prior to the
accident, plaintiff had been operating the business for a little
over three years, and described its progress as the "slow building
[of] a business from scratch." (Id. at 116).

As of the date of this first hearing, the business was still
partially in Mr. Salisbury's name, but he had hired someone "to
take over my responsibilities." (Id. at 99).[12] According to
plaintiff, his wife continued to handle the "[a]dministrative
side" of the business's operations. (Id. at 116).

Plaintiff also described several of his medical treatments
(Id. at 103-15), summarizing them broadly as "physical therapy,

---

[11] In addition to testimony about the landscaping business, plaintiff
briefly discussed his former employment as an EMT volunteer (Tr. 104) and
explained that, prior to starting the landscaping business, he had received
unemployment compensation for six months in the wake of a loss of a job. (Id.
at 111-12).

[12] According to Mr. Salisbury, prior to the accident, he was earning
"probably net $16,000, $17,000." (Id. at 100). Subsequent to the accident, the
landscaping business no longer earned Mr. Salisbury any profit, and his wife,
a teacher, used her salary to both support the family and make up for the losses
in the business. (Id. at 100). Plaintiff explained that these losses were
attributable to the need to pay the additional worker (or, possibly, workers,
see id. at 81-82) who took over for plaintiff's efforts. (Id. at 103). This
somewhat complicated interplay between plaintiff, his wife, and the landscaping
business was again the subject of discussion at the second hearing (id. at 70-
72, 81-84) and of repeated citation in the ALJ's second decision to deny
benefits. (See, e.g., id. at 43).

aqua therapy, and . . . continuing pain management." (Id. at 103).
More specifically, plaintiff identified Dr. Hosain[13] as the
physician he visits for pain management and "the best person that
would know [his] medical problems as far as [his] back problems."
(Id. at 103-04). Plaintiff explained that he first began treatment
with Dr. Hosain in approximately June 2008, after undergoing "a
physical therapy regimen and 16 weeks of aqua-therapy." (Id. at
106). Plaintiff stated that he had "suffered [through] all the[]
[physical therapy] treatments and nothing was working." (Id.).

        Plaintiff's attorney asked him about several of his
medications, including the Lidoderm[14] patch that he was using at
the time. (Id. at 104). According to plaintiff, this was a "5
percent" patch, applied every night, for purposes of pain relief,
and was "[n]ot really" helpful. (Id. at 104-05).[15] Plaintiff also
testified that in the period immediately following the accident -
- approximately March through June 2008 -- he was taking tramadol,[16]

_____

        [13] Dr. Hosain's name was erroneously spelled in this transcript as "Dr.
Hussain." (Compare Tr. 103 with id. at 760).
        [14] A Lidocaine patch, branded as Lidoderm, "[t]reats nerve pain." LIDOCAINE
PATCH,       U.S.       NAT'L       LIBRARY       OF       MEDICINE,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010942/ (last visited Aug. 20,
2015).
        [15] Although this segment of questioning appears to generally concern the
time contemporaneous with the hearing, a later portion clarified that plaintiff
was being treated with Lidoderm patches in the immediate aftermath of the
accident as well, also with Dr. Hosain. (Tr. 109).
        [16] Tramadol "[t]reats moderate to severe pain. This medicine is a narcotic
pain      reliever."      TRAMADOL,      U.S.      NAT'L      LIBRARY      OF      MEDICINE,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012486/ (last visited Aug. 5,
2015).

Cyclobenzaprine,[17] an anti-inflammatory, and "Alaxa-something."[18] (Id. at 109).[19] Plaintiff was also given a TENS machine,[20] but had since discontinued using it, due to its minimal effect and his inability to pay for the patches. (Id. at 114). Dr. Hosain also apparently suggested that losing weight would help with the pain, although despite significant weight-loss,[21] plaintiff discerned no related alleviation of his pain. (Id. at 110).

Plaintiff also testified at various points about his physical limitations. (See, e.g., id. at 107-08, 117-18). He stated that he was unable to walk for longer than 10-15 minutes and that, although he could walk to the end of his home's 100-foot-long driveway, "I would have pain." (Id. at 107-08).

---

[17] Cyclobenzaprine, or Flexeril, "is used to help relax certain muscles in your body. It helps relieve the pain, stiffness, and discomfort caused by strains, sprains, or injuries to your muscles." CYCLOBENZAPRINE, U.S. NAT'L LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009767/ (last visited Aug. 5, 2015).

[18] This is presumably a reference to the Meloxicam, or MOBIC, prescribed by Dr. Levin. (See Tr. 646).

[19] Plaintiff also testified that "most recently," Dr. Hosain "tried Voltaren Gel" (Tr. 109), which "contains diclofenac, a nonsteroidal anti-inflammatory drug (NSAID). Diclofenac works by reducing hormones that cause inflammation and pain in the body." VOLTAREN GEL, http://www.drugs.com/voltaren-gel.html (last visited Aug. 20, 2015). Presumably, plaintiff was not referring to the immediate post-accident period. Plaintiff stated that the Voltaren Gel was working "[a]bout the same as the patches. It doesn't really get deep enough to do anything." (Tr. 109).

[20] A transcutaneous electrical nerve stimulation, or TENS, unit "is a treatment for pain. A TENS is a small, portable, battery powered device." HOW TO USE A TENS UNIT, http://www.drugs.com/cg/how-to-use-a-tens-unit.html (last visited Aug. 5, 2015); see also 3 Attorneys Medical Advisor § 32:22.

[21] At this hearing, plaintiff stated that he was six feet two inches and weighed 340 pounds, having last been weighed two days earlier. (Tr. 109-10). He stated that, at the time of the accident, he had weighed 417 pounds (id. at 110), although the records from the March 3, 2008 hospitalization reflect a weight of 365 pounds. (Id. at 654).

Plaintiff's counsel further asked whether -- in the immediate aftermath of the accident -- plaintiff was indeed walking to the end of his driveway or "doing anything at all." (Id. at 108). Plaintiff answered in the negative (id.) and elsewhere stated that, at least as of March 9, 2008, he was entirely unable to work and "was home in my bed." (Id. at 105). According to plaintiff, even attempting to engage in physical activity similar to walking his driveway would render him unable to do "anything for a very long time afterwards," which he clarified meant that he needed about a day after exerting himself to "recharge" and "[w]ait for the pain to subside." (Id. at 108).

Plaintiff also explained that, in his job as a landscaper, he had been required to lift "[t]rees and equipment and shrubs, mulch, dirt," but that, subsequent to the accident, he could not perform any of these tasks. (Id. at 117-18). Moreover, plaintiff claimed that his muscles had so atrophied after the accident that he could "hardly open a jar of pickles." (Id. at 118).

In sum, according to plaintiff, there was no time between March 2008 and December 2008 when he was in a position to return to work, because of a combination of the injury, related pain, and depression. (Id. at 117).

13

ii. <u>Hearing on November 16, 2011</u>

1. <u>Plaintiff's Examination</u>

Subsequent to the Appeals Council remand, Mr. Salisbury testified before ALJ Katz at a second hearing (<u>Id.</u> at 60-94), the first half of which took place without the questioning of, or input from, the vocational expert. (<u>Id.</u> at 62-78). Plaintiff generally stated that he was suffering from the "same problems" as testified to at the first hearing, "maybe getting a little bit worse," and he was not looking for work. (<u>Id.</u> at 63, 65).

When Mr. Salisbury again testified that he "suffer[s] from depression," the ALJ questioned him on how the depression impacts his ability to work, to which plaintiff stated that "I can't concentrate. I feel hopeless." (<u>Id.</u> at 63-64). Plaintiff added that he had difficulty concentrating on "about any task that I have to do continually." (<u>Id.</u> at 64). On further questioning from the ALJ, plaintiff testified that he could watch an entire football game continuously "[a]s long as I can recline," read a newspaper, and drive a car "[i]f I have to." (<u>Id.</u> at 64). Plaintiff later clarified that his ability to watch an entire football game uninterrupted "would depend on the amount of pain I was in." (<u>Id.</u> at 77).

14

Plaintiff reiterated that the depression to which he was referring pre-dates the March 2008 accident. (Id. at 66). Although much of the testimony on this subject was duplicative of the previous hearing, plaintiff filled in a few blanks: It was his "regular doctor"[22] who prescribed the Wellbutrin after telling plaintiff that he was "suffering from depression." (Id. at 67-68). The onset of his depression -- after his father's death and his job loss -- was in approximately 2000 or 2001. (Id.). At one point, plaintiff stated, he "actually went to the hospital because I was vomiting uncontrollably," which plaintiff asserted was "the depression showing itself." (Id. at 67). Plaintiff also added that "[w]hen I started going for regular treatment they took me off [the Wellbutrin], put me on something different . . . [bec]ause it was not working anymore." (Id. at 68).

According to plaintiff -- although he was suffering from depression prior to the car accident and was able to work in that time period -- after the accident, the depression worsened. (Id. at 75-76). He explained that there was no time between March 3 and December 31, 2008 that he could have gone to work, stating that

---

[22] Plaintiff referred to this doctor as the physician treating him for "fiber tension also and diabetes." (Tr. 709). He was presumably discussing his then-primary care physician. Whether this is Dr. Mehar is not something we can discern from the record, although we note (and will address below) that, at least in 2006, Dr. Mehar was indeed plaintiff's primary care physician. (See id.).

"[i]nitially it was the pain from the back injury." (Id. at 76).
However, as time passed and the physical pain worsened -- and
plaintiff began to believe his injury permanent -- "I was getting
kind of depressed about not being able to provide for my family
and the fact that I was going to have to live with this pain for
the rest of my life." (Id.).

As of this second hearing, plaintiff was still taking both
Zoloft and Abilify, prescribed by Dr. Rochman (id.) and was still
seeing an affiliated social worker for one-on-one sessions. (Id.
at 73). At these appointments, plaintiff and the social worker
"basically just talk about stuff that's bothering me and she tries
to help me figure it out." (Id. at 73). According to plaintiff,
while Dr. Rochman reads and reviews the social worker's notes and
"asks me how I'm doing," plaintiff's appointments with Dr. Rochman
himself relate to his medications. (Id. at 74).

Plaintiff's attorney specifically pointed the ALJ to one of
the pages of notes from Dr. Rochman's office.[23] (Id. at 70, 72-73
(citing id. at 828)). This undated, handwritten note references

---

[23] At the hearing, plaintiff's attorney suggested that this page of notes
had been written by Dr. Rochman himself. (See Tr. 70, 72). In his decision
denying benefits, the ALJ likely rightly attributes these lines to one of the
social workers affiliated with Dr. Rochman's office. (See id. at 45, 828).

16

"physical trauma & emotional[24] & severe depression," indicates that plaintiff had not worked since March 3, 2008, and states that "[w]ithin a reasonable degree of medical certainty this pt. Micah Salisbury is fully disabled." (Id. at 828). Plaintiff's attorney characterized this note as "a retrospective opinion" given of the author's "own volition" (id. at 70), although the ALJ did not agree with that assessment, given that plaintiff did not commence treatment with Dr. Rochman until March 2009, a year subsequent to the car accident. (Id. at 72).

On a related note, plaintiff was questioned about his asserted inability to focus. (Id. at 76-78). He stated that, when he experiences this impairment -- which he averred was because of pain -- "I just block everything out. People talk to me and I don't respond." (Id. at 77). Plaintiff's attorney thus asked plaintiff, "[o]n a scale of one to ten, average day, where's the pain?", to which plaintiff responded "[e]ight or nine." (Id.). Plaintiff's counsel then framed a "ten" on the pain scale as "you've got to take me to the emergency room," and asked plaintiff how often he experiences a "ten." (Id.). Plaintiff answered, "[a]bout three

---

24 Plaintiff's attorney included the word "emotional" in his reading of this note at the hearing; however, the author of the note appears to have crossed this word out (a notation that, of course, might also simply be a function of the imprecise realities of viewing an administrative record that comprises copies of copies of handwritten notes). (Compare Tr. 72 with id. at 828).

times a week," but stated that he could not go "[r]unning to the emergency room, [because] it's just an option," presumably for financial reasons. (Id.). Plaintiff stated that, in that situation, he simply "take[s] pain meds and go[es to] lay down," and that, "[i]f I can lay horizontal on my back so there's no pressure . . . [for] [a]bout an hour," he is thereafter able to get back up. (Id. at 78). Plaintiff testified that "the same" had been happening to him since before December 31, 2008. (Id.).[25]

Plaintiff's counsel also questioned plaintiff about his visits with Dr. Jeffrey W. Degen. (Id. at 74-75).[26] According to plaintiff, he "wanted to get a second opinion" about his "back injury," hoping that this other doctor might recommend corrective surgery. (Id. at 74).

The questioning also involved plaintiff's family life. He testified that he lives with his wife, a high-school teacher, along with his oldest child, then age six, and his then-three-year-old twins. (Id. at 64-65). Plaintiff stated that, while his wife works, he stays home with the children and is able to care for them,

---

[25] As mentioned, at the first hearing, plaintiff testified to a similar need to "recharge" after experiencing pain. (Id. at 108). There, however, he was discussing pain resulting from physical activity and stated that he required about a day of rest for this pain to subside. (Id.).
[26] Dr. Degen's records are not separately identified in the index to the administrative record but are contained within a handful of other documents from Dr. Syed Hosain's office. (See Tr. 1007-13). See also infra pp. 36-42.

18

including changing their diapers, "because I have to." (Id. at 65).[27] Mr. Salisbury explained that "I don't know if I should be doing it. There's no plan B . . . [We] can't afford daycare." (Id.).

The ALJ also again asked plaintiff a number of questions about the businesses owned by him and his wife. (Id. at 70-72). As a matter of company structure, plaintiff clarified that the landscaping business "was a sister company underneath M & J Trucking." (Id. at 70). The ALJ asked plaintiff if he "continue[d] working with that company," to which plaintiff answered, "I continued to try to operate it, yes . . . I just closed [it at] the end of October [2011]." (Id.). The ALJ inquired whether, given his wife's teaching responsibilities, plaintiff was "the one that was operating the business." (Id. at 71). Plaintiff answered, "No. She was[,] . . . [a]t night. . . . And I had to pay somebody to do the actual work." (Id.).[28]

---

[27] In an earlier "function report," plaintiff reported that, at one time, a babysitter came to the house to change diapers and attend to other matters relating to childcare. (See Tr. 606).

[28] After this hearing, plaintiff's wife submitted an affidavit according with her husband's characterization of the business. (See Tr. 43 & n.2). That affidavit, contained in the record before us, states, inter alia, as follows: (1) "Since the accident of March 3, 2008, I have been operating all aspects of my husband's landscaping/trucking business in addition to my full-time teaching job"; (2) "[M]y husband . . . has not taken part in the business in any way since the accident due to the injuries he sustained and from the depression from which he suffers"; and (3) "As time went on and I realized that my efforts to maintain the business were fruitless as I was investing valuable time into a losing proposition, the business was closed in October 2011." (Id. at 326).

## 2. The Vocational Expert's Examination

The second half of the hearing involved testimony from, and relating to, vocational expert Darren Flomberg (id. at 79-94), a certified Disability Management Specialist, Case Manager, Rehabilitation Counselor, and Registered Vocational Expert Witness. (Id. at 220-22). Mr. Flomberg first summarized his impressions of plaintiff's relevant work experience. (Id. at 80).[29] He "saw in the record four different job titles": (1) emergency medicine technician, which he labeled as "DOT[30] code 079.379-

---

[29] Plaintiff had filled out a "work history report" for the SSA. (See Tr. 616-23).

[30] The Dictionary of Occupational Titles ("DOT"), published by the Department of Labor, is commonly utilized by vocational experts ("VEs") in their assessments of claimants' job prospects, as explicitly instructed by the SSA. See POLICY INTERPRETATION RULING: TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS, SSR 00-4P (S.S.A.), 2000 WL 1898704 (Dec. 4, 2000); see also Wellington v. Astrue, 2013 WL 1944472, *3 (S.D.N.Y. May 9, 2013); McAuliffe v. Barnhart, 571 F. Supp. 2d 400, 407 (W.D.N.Y. 2008). As stated by the relevant SSA ruling, "[o]ccupational evidence by a VE . . . generally should be consistent with the occupational information supplied by the DOT." Id. This ruling goes on to state as follows:

> When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

> Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

POLICY INTERPRETATION RULING: TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS, SSR 00-4P (S.S.A.), 2000 WL 1898704 (Dec. 4, 2000).

010[31]" and characterized as "[m]edium strength" and "skilled, SVP
5,"[32] (2) landscaper, DOT code 480.687-014, heavy and unskilled
work, SVP 2,[33] (3) loss prevention worker or "security guard," DOT

---

[31] These number codes correspond to specific job titles in the DOT. See DOT 4TH ED., REVISED 1991, http://www.oalj.dol.gov/libdot.htm. We note that the job of "Emergency Medical Technician," to which Mr. Flomberg was obviously referring, is contained at code 079.374-010. Given that code 079.379-101 does not exist, we presume his citation to this number was an inadvertent error.

[32] The DOT listings contain "a specific vocational preparation (SVP) time for each described occupation. Under the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." POLICY INTERPRETATION RULING: TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS, SSR 00-4P (S.S.A.), 2000 WL 1898704 (Dec. 4, 2000); see also Castillo v. Colvin, 2015 WL 153412, *10 n.19 (S.D.N.Y. Jan. 15, 2015); Sokolowski v. Comm'r of Soc. Sec., 2014 WL 2532485, *6 n.6 (N.D.N.Y. June 5, 2014).

The Emergency Medical Technician job is described in the DOT as follows:

Administers first-aid treatment to and transports sick or injured persons to medical facility, working as member of emergency medical team: Responds to instructions from emergency medical dispatcher and drives specially equipped emergency vehicle to specified location. Monitors communication equipment to maintain contact with dispatcher. Removes or assists in removal of victims from scene of accident or catastrophe. Determines nature and extent of illness or injury, or magnitude of catastrophe, to establish first aid procedures to be followed or need for additional assistance, basing decisions on statements of persons involved, examination of victim or victims, and knowledge of emergency medical practice. Administers prescribed first-aid treatment at site of emergency, or in specially equipped vehicle, performing such activities as application of splints, administration of oxygen or intravenous injections, treatment of minor wounds or abrasions, or administration of artificial resuscitation. Communicates with professional medical personnel at emergency treatment facility to obtain instructions regarding further treatment and to arrange for reception of victims at treatment facility. Assists in removal of victims from vehicle and transfer of victims to treatment center. Assists treatment center admitting personnel to obtain and record information related to victims' vital statistics and circumstances of emergency. Maintains vehicles and medical and communication equipment and replenishes first-aid equipment and supplies. May assist in controlling crowds, protecting valuables, or performing other duties at scene of catastrophe. May assist professional medical personnel in emergency treatment administered at medical facility.

DOT at 079.374-010.
[33] The Landscape[r] job is described in the DOT as follows:

code 372.667-038, light and semi-skilled work, SVP 3,[34] and (4)

truck driver, DOT code 905.663-014, medium strength and semi-

skilled work, SVP 4.[35] (Id.).

---

Moves soil, equipment, and materials, digs holes, and performs
related duties to assist LANDSCAPE GARDENER (agriculture) 408.161-
010 in landscaping grounds: Digs holes for plants and trees, using
pick and shovel. Mixes fertilizer or lime with dirt in bottom of
holes to enrich soil, places plants or trees in holes, and adds
dirt to fill holes. Attaches wires from planted trees to stakes to
support trees. Hauls or spreads topsoil, using wheelbarrow and rake.
Waters lawns, trees, and plants, using portable sprinkler system,
hose, or watering can. Spreads straw over seeded soil to prevent
movement of seed and soil. Builds forms for concrete borders, using
lumber, hammer, and nails. Mixes and pours cement for garden
borders. Places decorative stones and plants flowers in garden
areas. Mows lawns, using power mower.

DOT at 408.687-014.
[34] The security guard job, also labeled in the DOT as "Merchant Patroller,"
is described as follows:

Patrols assigned territory to protect persons or property: Tours
buildings and property of clients, examining doors, windows, and
gates to assure they are secured. Inspects premises for such
irregularities as signs of intrusion and interruption of utility
service. Inspects burglar alarm and fire extinguisher sprinkler
systems to ascertain they are set to operate. Stands guard during
counting of daily cash receipts. Answers alarms and investigates
disturbances [ALARM INVESTIGATOR (business ser.)]. Apprehends
unauthorized persons. Writes reports of irregularities. May call
headquarters at regular intervals, using telephone or portable
radio transmitter. May be armed with pistol and be uniformed. May
check workers' packages and vehicles entering and leaving premises.

DOT at 372.667-038.
[35] The Truck Driver job is described in the DOT as follows:

Drives truck with capacity of more than 3 tons, to transport
materials to and from specified destinations: Drives truck to
destination, applying knowledge of commercial driving regulations
and area roads. Prepares receipts for load picked up. Collects
payment for goods delivered and for delivery charges. May maintain
truck log, according to state and federal regulations. May maintain
telephone or radio contact with supervisor to receive delivery
instructions. May load and unload truck. May inspect truck equipment
and supplies, such as tires, lights, brakes, gas, oil, and water.
May perform emergency roadside repairs, such as changing tires,
installing light bulbs, tire chains, and spark plugs. May position
blocks and tie rope around items to secure cargo during transit.
When driving truck equipped for specific purposes, such as fighting

Then, based on the ALJ's reading of plaintiff's tax returns and earlier questioning, the ALJ explained to Mr. Flomberg that "[i]t looks like he was actually more than a driver. It looks like he was actually running a business." (Id.). The ALJ then asked whether that reality would alter Mr. Flomberg's recitation of plaintiff's work history. (Id.).

Mr. Flomberg in turn asked whether, in plaintiff's capacity as part-owner of M & J Trucking, he oversaw or managed other people. (Id. at 81). In response, plaintiff explained that, in 2004, he started the company with a single truck that he owned and "just [did] the trucking which consisted of just delivering dirt to people's houses." (Id. at 81-82). When plaintiff began the landscaping business in 2006, "the trucking kind of disappeared cause there was more money in the landscaping I thought. So the truck was just used to move the lawn cutting equipment around." (Id. at 82).

---

fires, digging holes, and installing and repairing utility company lines, may be designated Fire-Truck Driver (petrol. & gas); Hole-Digger-Truck Driver (construction; tel. & tel.; utilities); Tower-Truck Driver (tel. & tel.; utilities). When specializing in making deliveries, may be designated Delivery-Truck Driver, Heavy (any industry). May be designated according to type of truck driven as Truck Driver, Flatbed (logging). May be designated according to kind of cargo transported as Water Hauler (logging).

DOT at 905.663-014.

With respect to the managing and hiring of others, plaintiff stated that he "had to hire somebody to do the work cause I couldn't" (id. at 81), which was presumably a reference to his 2008 injury. On this subject, at first plaintiff confirmed that he had both managed and hired employees (id.), later elaborating that, until he closed the business in 2011, others did the physical labor, including a cousin. (Id. at 82).

The ALJ asked as follows: "[P]eople would call you and you would send out the truck or the landscape people to do what ever they wanted you to do?" (Id.). Plaintiff answered, "[r]ight." (Id.). The ALJ then asked, "[d]id you estimate the jobs?", to which plaintiff answered in the negative. (Id.).[36] The ALJ also asked as follows: "So you were mostly in an office, sitting at home, or something?" (Id. at 82-83). To this question, Mr. Salisbury answered that "[m]y wife did all the calls and she actually worked with the people." (Id. at 83). The ALJ subsequently asked, "[y]ou were not able to take a call and work with people?", and plaintiff responded, "I had no interest in calling people back." (Id.).

---

[36] There is some evidence to the contrary in the record, at least with respect to an earlier time period. On February 5, 2009, plaintiff filled out and signed a "Self-Employment/Corporate Office Questionnaire" for the SSA. (Tr. 255-59). There, he typed that "[b]efore being disabled I did most of the paperwork, estimates, client care calls, dumpster drop-off and pickup, waste removal, lawn mowing, constructions, gardening, snow plowing, shovel and salting, banking and vehicle maintenance." (Id. at 256). To a subsequent question about his "current" work activates, plaintiff wrote that "I am no longer able to do the work listed above. I may do an estimate. My wife often drives me to the site." (Id.).

It was at this point that plaintiff's counsel interjected, stating that he "just want[ed] to clarify." (Id.). "Micah," counsel said,

> you're testifying that I did this, and I did that, and I hired people, and you're responding to the questions that I did all this. But your testimony is that your -- your previous testimony is that your wife was running a business. Are you saying I because you're thinking [sic] -- why are you saying I did it, is really the question. To clarify.

(Id.). "I felt it was my business," plaintiff answered. (Id.). Plaintiff's counsel then asked as follows: "But did you actual[ly] do – were you actually the one who got on the phone and hired these people to do work or was it your wife?" (Id.). Mr. Salisbury answered clearly: "It was my wife." (Id.).

Accordingly, given what he had heard, Mr. Flomberg finally addressed the ALJ's question as to whether he would amend his earlier testimony about plaintiff's work experience, given the details of the trucking and landscaping businesses: "Okay. Alright. The transferable skills aren't an issue. I would not amend my testimony because it sounds like although he owned a business he didn't necessarily run it." (Id. at 83-84).

The questioning next turned to the jobs that plaintiff might be able to perform, given his restrictions. (Id. at 84-93). The ALJ provided the expert with a hypothetical, asking whether there

were any performable jobs by a person with the following "vocational profile": (1) "Someone of the claimant's age,[37] education, and work experience" (2) in the Poughkeepsie-Middletown-Newburgh area (3) who was able to sit for six hours during a typical eight-hour work day, (3) stand and walk for four hours during a typical eight-hour work day, and (4) lift and carry items weighing 10 pounds, (5) but was unable to perform "highly aerobic activity" (6) and was further limited by "emotional impairment to the extent where he can only perform basic unskilled work tasks that do not require, you know, substantial concentration." (Id. at 84).

Classifying "[t]his person [a]s a sedentary unskilled worker" (id.), Mr. Flomberg stated that this worker could perform three jobs. (Id. at 85-89). First, he proposed "surveillance system monitor," code 379.367-010 in the DOT, a sedentary and unskilled job, at SFP 2. (Id. at 85; see also id. at 92-93).[38] In the local

---

[37] Plaintiff was 40 years old at the time. (Tr. 83, 653).

[38] The Surveillance System Monitor job is described in the DOT as follows:

Monitors premises of public transportation terminals to detect crimes or disturbances, using closed circuit television monitors, and notifies authorities by telephone of need for corrective action: Observes television screens that transmit in sequence views of transportation facility sites. Pushes hold button to maintain surveillance of location where incident is developing, and telephones police or other designated agency to notify authorities of location of disruptive activity. Adjusts monitor controls when required to improve reception, and notifies repair service of equipment malfunctions.

economy, he opined that 60 such jobs exist[39] and, in the national economy, he testified that there would be 8,278 jobs. (Id. at 85). When the ALJ asked whether this was a job that required "a lot of focus and concentration," Mr. Flomberg stated that "[w]ell it does require paying attention to closed circuit monitors. So yeah. It would require focus. Yes." (Id. at 86). When further pressed, Mr. Flomberg was unable to say how much focus was required, but stated that, based on his own experience, "you could momentarily lose focus but not really much more and not necessarily all that frequently." (Id.).[40]

Mr. Flomberg next proposed that the hypothetical worker could perform the job of "table worker," code 739.687-182 in the DOT, a sedentary and unskilled job,[41] at SVP 2. (Id.).[42] Summarizing this

---

DOT at 379.367-010. According to Mr. Flomberg, speaking in contemporary terms, "these jobs are typically employed in casino settings. So you're watching a gambling floor and other activities." (Tr. 86).

[39] Mr. Flomberg specifically stated that "because of the area you're talking about the number of jobs may actually be limited in their numbers" and that there "would be fewer jobs in this area than, let's say, the White Plains area or the New York City area or even the Albany area." (Tr. 85).

[40] On this point, Mr. Flomberg also stated that his impressions about the focus-requirements of the job were "inconsistent with the DOT." (Tr. 86). It is not clear from either the record or the relevant DOT entry to what Mr. Flomberg was referring, and the ALJ did not inquire further. (Id.).

[41] Mr. Flomberg did not explicitly state that this job was unskilled, although the testimony of it being SVP 2 confirms this fact (see Tr. 86), as does the DOT listing itself. See DOT at 739.687-182.

[42] The Table Worker job is described in the DOT as follows:

Examines squares (tiles) of felt-based linoleum material passing along on conveyor and replaces missing and substandard tiles.

DOT at 739.687-182.

27

job as "an inspector position" requiring a worker in a production setting "to make sure that the assembly was proper," he stated that there would be 530 local jobs[43] and 3,641 in the national economy. (Id. at 87).

Finally, Mr. Flomberg stated that the hypothetical employee could work as a "telephone quotation clerk," code 237.367-046, a sedentary and unskilled job, at SVP 2. (Id. at 87).[44] According to Mr. Flomberg, "this person would, over the phone, give information regarding the prices of stocks and bonds and other commodities that are traded." (Id.). The vocational expert testified that there are approximately 100 such jobs in the local economy and 7,000 nationally. (Id. at 88).[45,46]

---

[43] Mr. Flomberg actually stated that "in this area there would be 530 occupations," which we take to mean jobs (Tr. 87), an interpretation also followed by the ALJ in his second decision to deny benefits. (See id. at 52).

[44] The Telephone Quotation Clerk is described in the DOT as follows:

> quote clerk; telephone-information clerk Answers telephone calls from customers requesting current stock quotations and provides information posted on electronic quote board. Relays calls to REGISTERED REPRESENTATIVE (financial) 250.257-018 as requested by customer. May call customers to inform them of stock quotations.

DOT at 237.367-046.

[45] The ALJ asked Mr. Flomberg whether there were any "general telephone type jobs where a person would, you know, be an operator or a receptionist." (Tr. 88). The vocational expert explained that those positions -- telemarketers, for example -- are semi-skilled and SVP 3, which would require at least one to three months of training. (Id.).

[46] Mr. Flomberg also generally testified about the unskilled labor market, stating that "there's very little demand in the economy for sedentary unskilled work" and that "[u]nskilled work at the sedentary level makes up only half of a percent." (Tr. 88-89). He added that, according to the DOT, there are 130 sedentary unskilled occupations, of which the vast majority "are in production and manufacturing." (Id. at 89). According to the vocational expert, production and manufacturing "simply is an industry that has been on the decline rapidly

Following the ALJ's examination of the vocational expert, plaintiff's counsel asked Mr. Flomberg a number of questions. (Id. at 89-93). First, counsel pressed Mr. Flomberg about whether "the limitation on the ability to focus, to remain on task, [would] negate any of [the suggested] jobs." (Id. at 90). Mr. Flomberg asked for clarification, given that "the ability to focus is generally an important part of almost any job." (Id.). In response, counsel stated that he was "thinking [of] a person with an inability to focus which also has difficulty thinking and concentrating, is emotionally withdrawn, has memory impairment" and is about "five percent off-task on all of those." (Id.). Counsel summarized his hypothetical by asking Mr. Flomberg to opine on a worker's ability to perform the three suggested jobs when that worker was "15 percent off-task." (Id.).

In response, Mr. Flomberg testified that he believed that this restriction "would have a negative impact" on "any job" and that, specifically, this unfocused hypothetical worker would be unable to perform the three suggested jobs. (Id. at 91).

Finally, plaintiff's counsel asked Mr. Flomberg whether "be[ing] absent from work four to five times a month" would affect

---

year after year." (Id.). He added that "[v]ery few clerical jobs . . . are unskilled." (Id.).

an employee's job prospects. (Id.). Mr. Flomberg stated that, while "jobs do allow for time off from work[,] . . . that type of being off of work on a regular basis would make maintaining employment impossible" and that "[i]f you had to call in sick once a week, every week . . . you probably would not have any job very long." (Id.).

c. Medical Records: Treating Sources

i. Hospitalization of March 3, 2008

Plaintiff was hospitalized on March 3, 2008, subsequent to his car accident, complaining, inter alia, of "CERVICAL PAIN." (Id. at 654). The records report that he was experiencing "Pain with Movement" and "Tenderness on Palpation," with the injury location listed as "CERVICAL" and "LOW BACK." (Id. at 655).

The hospital records noted the following conditions in his medical history: (1) HTN,[47] (2) ulcerative colitis,[48] (3) acid reflux, (4) renal colic, and (5) depression. (Id. at 654). Additionally, the records reflect that plaintiff was taking the

---

[47] "HTN: hypertension." 8 Attorneys Medical Advisor § 85:7.
[48] "Ulcerative colitis is an acute inflammatory disease of the lining (mucosa) of the colon and rectum." 1 Attorneys Medical Advisor § 15:80.

following medications at the time: (1) Asacol,[49] (2) Lisinopril,[50] (3) Zantac,[51] (4) Lasix,[52] (5) Mirtazapine,[53] (6) Wellbutrin, and (7) Humulog.[54] (Id.).

The ER sent plaintiff for X-rays, which resulted in two reports. (Id. at 654-59). The first report described the results of X-rays of plaintiff's lumbar spine. (Id. at 657-58). There was no evidence of fracture, the "[l]umbar vertebral bodies maintain normal vertical height," and there was no evidence of

---

[49] "Mesalamine [branded as Asacol] is used to treat and prevent an inflammatory bowel disease called ulcerative colitis. It works inside the intestines (bowel) to reduce the inflammation and other symptoms of the disease." MESALAMINE, U.S. NAT'L LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011105/?report=details (last visited Aug. 5, 2015).

[50] "Lisinopril is used alone or together with other medicines to treat high blood pressure (hypertension)." LISINOPRIL, U.S. NAT'L LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010968/ (last visited Aug. 5, 2015).

[51] Ranitidine, branded as Zantac, "[t]reats and prevents heartburn. Also treats stomach ulcers, gastroesophageal reflux disease (GERD), and conditions that cause too much stomach acid." RANITIDINE, U.S. NAT'L LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011947/?report=details (last visited Aug. 5, 2015).

[52] Furosemide, branded as Lasix, "[t]reats fluid retention and high blood pressure." FUROSEMIDE, U.S. NAT'L LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010414/?report=details (last visited Aug. 5, 2015).

[53] "Mirtazapine is used to treat depression. Mirtazapine belongs to a group of medicines called tetracyclic antidepressants. These medicines work in the central nervous system (CNS) to make certain chemicals in the brain stronger." MIRTAZAPINE, U.S. NAT'L LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011242/?report=details (last visited Aug. 5, 2015).

[54] Insulin Lispro, branded as Humulog, "[t]reats diabetes mellitus. This type of insulin starts working faster than regular insulin." INSULIN LISPRO, U.S. NAT'L LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010736/?report=details (last visited Aug. 5, 2015).

spondylolisthesis.[55] (Id. at 657). The report noted, however, that "[t]here are degenerative changes which affect the posterior elements of the lower lumbar spine. Degenerative disc disease is seen at the L1-2 inverterbral disc space. There are calcifications in the right upper quadrant. Clinical correlation is recommended." (Id.). The reviewing doctor summarized these findings as follows: "No evidence of fracture. Degenerative disc and joint disease." (Id.). The second report described the results of X-rays of plaintiff's cervical spine, and simply reported "[n]o evidence of fracture." (Id. at 659).

Plaintiff was discharged from the hospital, under advisement that he follow up with his primary care physician, Dr. Mehar. (Id. at 655).[56]

ii. Treating Physician: Dr. Scott Levin

On or about March 25, 2008, plaintiff visited Somers Orthopaedic Surgery & Sports Medicine, P.L.L.C. for treatment with

---

[55] Spondylolisthesis "is caused by one vertebra slipping forward over another, causing a lesion between them. Low-back pain that radiates to the thighs is the characteristic symptom." 1 Attorneys Medical Advisor § 15:32.

[56] Although the hospital records do not appear to include this information, Dr. Levin notes that plaintiff "was sent home [from the hospital] with pain medications and the muscle relaxant." (Tr. 644).

Dr. Scott Levin, for neck and lower-back pain. (Id. at 640, 644).[57]
According to Dr. Levin, plaintiff was "continuing to complain of
pain at this time. He says the pain involves a little bit of his
neck; however, more severely his lower back. It seems to be
diffusely across his entire lower back." (Id. at 644).

Dr. Levin examined plaintiff and generally noted that he was
an obese male, was "alert and oriented x3," and that his mood and
affect were normal. (Id. at 645). Dr. Levin observed that plaintiff
had "diffuse cervical paraspinal muscle tenderness" and "diffuse
tenderness in the lumbar spine and the paraspinal muscles." (Id.).
Dr. Levin also wrote that plaintiff had "good range of motion" and
"5/5 strength" in both his upper and lower extremities. (Id.). Dr.
Levin reviewed the hospital X-rays and concurred that they "do[]
not show any evidence of fractures or dislocations of the cervical
or lumbar spine." (Id.).

Dr. Levin concluded his report, which was sent to Dr. Mehar,
by diagnosing plaintiff as a "36-year-old male with cervical and
lumbar muscle strains." (Id. at 646). He recommended initiating

---

[57] At this appointment, plaintiff provided Dr. Levin with a list of
medications. (Tr. 640). This list is essentially identical to that reflected in
the March 3, 2008 hospital records, except for the absence of Mirtazapine.
(Compare id. with id. at 654).

physical therapy[58] and following up with plaintiff in four weeks' time for reevaluation. (Id.). Finally, Dr. Levin provided plaintiff with prescriptions for "MOBIC"[59] and Flexeril. (Id.).[60]

Dr. Levin next saw plaintiff on April 16, 2008. (Id. at 647-49). He reported plaintiff's diagnosis as "unchanged." (Id. at 647). At this appointment, plaintiff reported that "his neck is feeling better; however, his back is continuing to hurt . . . and [he] has not improved at all." (Id. at 648). Dr. Levin reported that plaintiff "is not able to work still and he is not making any progress with physical therapy." (Id. at 648).

---

[58] There are two batches of physical therapy records in the administrative record before us, one from a provider called "Fitness Forum" (Tr. 507-25) and another from "Peak Physical Therapy." (Tr. 580-95). These records reflect plaintiff's regular attendance at numerous sessions during which he underwent varied treatments and participated in a myriad of rehabilitative exercises, therapy that continued through plaintiff's treatment with Dr. Hosain in late 2008 and early 2009. (See, e.g. id. at 508-10, 511-15, 521-25). Although in late February 2009, Dr. Hosain prescribed further therapy (id. at 594), no later physical therapy records are provided and, indeed, plaintiff appears to have ceased this treatment in early 2009. (See id. at 417-18).

As something of an aside, plaintiff bubbled-in a physical therapy questionnaire on October 30, 2008, in which plaintiff averred that pain prevented him from sitting or standing for longer than 10 minutes, that he could not walk more than a quarter-of-a-mile without increasing pain, and that he could only lift very light weights (which we note is the most severe of the five options plaintiff was able to choose). (Id. at 512).

[59] MOBIC, or Meloxicam, is a "nonsteroidal anti-inflammatory drug (NSAID) used to relieve the symptoms of arthritis (juvenile rheumatoid arthritis, osteoarthritis, and rheumatoid arthritis), such as inflammation, swelling, stiffness, and joint pain." MELOXICAM, U.S. NAT'L LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011069/ (last visited Aug. 5, 2015).

[60] The record also contains a May 20, 2008 "letter of medical necessity," written to an unknown recipient, in which Dr. Levin again summarizes his initial appointment with Mr. Salisbury, echoing the above. (Tr. 526).

34

On physical examination, Dr. Levin noted that plaintiff "has quite a bit of tenderness to palpation diffusely in the lumbar spine." (Id.). Dr. Levin diagnosed plaintiff with "[l]umbar muscle strain," provided him a "lumbar corset for support," sent him for an MRI of the lumbar spine "to rule out a herniated disc or other possible causes for this pain other than a muscle strain," and decided to "keep him out of work until further notice." (Id. at 648; see also id. at 649).[61]

Plaintiff next met with Dr. Levin on April 30, 2008 (id. at 650-52), after the MRI, which had taken place on April 23, 2008. (Id. at 493-95). Plaintiff's diagnosis remained unchanged, and Dr. Levin observed that "[h]e is still having the same pain and, in fact, it seems to be a little worse." (Id. at 650-51). Dr. Levin repeated that "[o]n physical examination, he has significant tenderness to palpation diffusely across the lumbar spine." (Id. at 651). Dr. Levin also reviewed plaintiff's MRI results and explained that they reveal "that there is some L4-L5 facet arthritis and mild disc bulge at L5-S1. No other disc herniations or osseous abnormalities are noted." (Id. at 651; see also id. at 493-95 [MRI results]).

---

[61] In a May 20, 2008 letter, Dr. Levin summarized plaintiff's state at the April 16, 2008 follow-up appointment: "He continued to have quite a significant amount of discomfort in his lower back at that point." (Tr. 526).

Given plaintiff's "[p]ersistent low back pain that is not responding to physical therapy or medications," Dr. Levin referred him to a specialist[62] "for further evaluation and treatment of this pain." (Id. at 651). Finally, Dr. Levin wrote out three prescriptions, one for Percocet,[63] a second for Flexeril, and a third that stated that "Micah is out of work until further notice." (Id. at 652).

### iii.  Treating Physician: Dr. Syed Iqbal Hosain

#### 1. Appointments and Injections in 2008

On June 24, 2008, plaintiff sought treatment with Dr. Syed Iqbal Hosain, board certified in anesthesiology and pain management. (Id. at 760). According to Dr. Hosain, plaintiff visited his office "complaining of pain in the lower back" and "suffering from aching and throbbing constant pain across the lower back." (Id.).[64] Plaintiff explained to Dr. Hosain "that standing

---

[62] In Dr. Levin's notes, he specifically referred plaintiff to Dr. Nick Panaro (Tr. 651), whose name does not again appear in the record before us. Instead, plaintiff sought treatment with Dr. Hosain, to whom we turn below.

[63] Oxycodone/Acetomenophen, or Percocet, "[t]reats moderate to moderately severe pain. This medicine is a narcotic pain reliever." OXYCODONE/ACETOMENOPHEN, U.S. NAT'L LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011543/ (last visited Aug. 5, 2015).

[64] Dr. Hosain also then noted plaintiff's medical history, including depression (Tr. 758, 760), as he did at other appointments. (See, e.g., id. at 747, 752).

in one position for more than 10 minutes, sitting in one position, bending over and lifting more than five to 10 pounds weight exacerbate the pain." (Id.). After examining plaintiff's back,[65] Dr. Hosain diagnosed plaintiff as "appear[ing] to be suffering from lumbago,[66] chronic lumbar strain" and recommended that he try "conservative treatments," like "continuation of cyclobenzaprine, use of a TENS machine at home and Lidoderm patch." (Id. at 761).

Plaintiff followed up with Dr. Hosain on July 30, 2008. (Id. at 754). Plaintiff "continue[d] to have aching throbbing pain in the middle of his back" and reported that "[p]hysical therapy has so far been of little help to his pain," which was "made worse by movement especially bending." (Id. at 754).[67] Examining plaintiff, Dr. Hosain observed that plaintiff "remains diffusely tender in his low and mid back" and assessed plaintiff as suffering from "myofascial pain in the back." (Id. at 754). According to Dr. Hosain, "[g]iven the etiology of his pain and his past history of depression the patient is likely to have persisting chronic back

---

[65] Dr. Hosain wrote that "[p]alpation over the left and right lumbar paravertebral areas was diffusely tender" at certain points and that "[m]ovements of the back were limited by pain felt in the back." (Id. at 761).

[66] "Low back pain." 7 Attorneys Medical Advisor § 71:13.

[67] At this appointment, and at numerous others, Dr. Hosain noted that plaintiff was "alert awake and oriented in time place and person," "well nourished," "appeared to have good insight into the medical condition," "appeared to have a normal affect and mood," "demonstrated good recall of past events in the near term and long term," and "walked with a normal gait." (See, e.g., Tr. 754, 749).

pain for some period of time. Recovery from his condition is likely to be slow and drawn out." (Id. at 754). A similar follow-up took place on August 27, 2008. (Id. at 753).[68]

As part of Dr. Hosain's treatment of plaintiff, trigger point injections[69] began on October 8, 2008. (Id. at 822-27). On November 5, 2008,[70] plaintiff followed up with Dr. Hosain, reporting that the injections were "a tremendous help to his low back pain" and "seemed to reduce his lower back pain considerably." (Id. at 749). This appointment precipitated another round of injections on November 25, 2008. (Id. at 813-18).

---

[68] While there is little of note in the records from the August 27, 2008 appointment, Dr. Hosain did note that plaintiff "reported that [his] medications do reduce his pain by about 30 to 40%." (Tr. 753).

[69] "Myofascial trigger points (TPs) have been defined as skeletal muscle focal points that are hypersensitive to pressure." 8 Attorneys Medical Advisor § 74:45. "The basic treatment is stretching the muscle, in which the TP resides, to the full extension . . . Injection directly into the TP, before stretching, is a newer variation." Id. at § 74:76.

[70] On November 3, 2008, Dr. Hosain wrote a letter to plaintiff's insurance carrier, explaining that plaintiff "received treatment at my office consisting of trigger point injections that were a tremendous help to his pain." (Tr. 750). Dr. Hosain noted that plaintiff had been "assessed at an independent medical evaluation," which resulted in a report that determined that he "should no longer receive this treatment despite the benefit the patient gets from these injections." (Id. at 750). Dr. Hosain appears to be referring to Dr. Sunitha Polepalle, who issued an IME report on October 3, 2008. (See id. at 668-72). Dr. Hosain therefore "request[ed] that the insurance carrier reconsider their decision to not allow Mr. Salisbury his treatment." (Id. at 750). Given the numerous trigger point injections subsequent to November 2008 (see, e.g., id. at 741-45, 801-12) and plaintiff's professed financial state (see, e.g., id. at 65), we presume (without confirmation in the record) that the insurance company ultimately agreed with Dr. Hosain over Dr. Polepalle.

2. <u>Subsequent Appointments and Injections</u>

Plaintiff had another set of trigger point injections on January 7, 2009 (<u>id.</u> at 744-45, 806-12) and again on February 10, 2009. (<u>Id.</u> at 741-43, 801-05). On March 17, 2009, plaintiff followed up with Dr. Hosain, reporting that "he is still experiencing a lot [of] back pain despite undergoing trigger point injections and other conservative treatments." (<u>Id.</u> at 740; <u>see also id.</u> at 800). After an examination of the back, Dr. Hosain assessed plaintiff as experiencing "lumbago possible lumbar facet disease" and recommended that plaintiff "undergo diagnostic lumbar facet injection." (<u>Id.</u> at 740).

On March 26, 2009, Dr. Hosain administered a "Facet/Median Branch Block" (<u>id.</u> at 795), also described as a "lumbar facet injection." (<u>Id.</u> at 794; <u>see also id.</u> at 736-38, 792-99). Plaintiff followed up with Dr. Hosain on April 8, 2009, reporting that "the lumbar facet injections were of no help to his back pain." (<u>Id.</u> at 739; <u>see also id.</u> at 791).

Plaintiff underwent additional sets of trigger point injections on May 26, 2009 (<u>id.</u> at 734-35, 787-90), July 23, 2009 (<u>id.</u> at 732-33, 777-86), September 29, 2009 (<u>id.</u> at 730-31, 770-76), December 22, 2009 (<u>id.</u> at 728-29, 764-69), February 16, 2010

(id. at 720-27), April 2, 2010 (id. at 712-717, 759), March 4, 2011 (id. at 999-1000), May 24, 2011 (id. at 997-98, 1032-38), July 15, 2011 (id. at 995-96, 1025-31), and September 9, 2011. (Id. at 993-94, 1018-24).[71,72]

### 3. Narrative Letters

On March 6, 2010, Dr. Hosain wrote a report at the request of plaintiff's counsel, which Dr. Hosain characterized as "my expert opinion . . . with respect to injuries sustained in a motor vehicle accident which occurred on March 3, 2008 . . . within a reasonable degree of medical certainty." (Id. at 718). Dr. Hosain first summarized his June 24, 2008 appointment, at which Mr. Salibury explained that "the pain was exacerbated by standing in one position for more than about 10 minutes or sitting in one position," that "bending over and lifting more than 5 to 10 pounds weight also exacerbated his pain," and that "rest was the only

---

[71] For the May 26, 2009 appointment -- and several others subsequent to it -- Dr. Hosain's examination of plaintiff reflected, inter alia, "restrictions of range of motion in the right back" and "muscular deconditioning in the right gluteus muscles." (Tr. 734; see also id. at 728, 730, 732). As of the February 16, 2010 appointment, this description changed somewhat, and Dr. Hosain noted upon examination that "[t]here is restrictions of range of motion in the right back and neck" and "muscular deconditioning in the right gluteus muscles and right trapezius muscles." (Id. at 726). This too appears to have continued in future visits. (See, e.g., id. at 712, 999).

[72] While these are the only dated records before us that reflect trigger point injections, a subsequent letter from Dr. Hosain, dated November 11, 2011, explained that Mr. Salisbury "undergoes trigger point injections at intervals of about 2-3 months" (Tr. 1052), presumably reflecting continued treatment of this sort subsequent to September 2011.

relieving factor for his pain." (Id.). According to Dr. Hosain, "[m]y initial diagnosis was that the patient was suffering from lumbago and chronic lumbar strain. His prognosis appeared fair." (Id.).

Dr. Hosain also wrote that "[i]t is my medical opinion that Mr. Salisbury's lower back condition is likely to be very long lived if not permanent. I base this on the fact that his condition has not improved in the past 20 months since he consulted me." (Id.). Dr. Hosain then turned to Mr. Salisbury's ability to work, explaining that "[t]he patient's regular occupation duties as a landscaper require him to bend frequently and lift heavy loads. The patient has been disabled from this occupation since the date of accident. He remains disabled from this occupation at this time." (Id. at 719). Dr. Hosain reiterated that "[t]he patient was unable to work at his regular occupation from March 3, 2008 until the present time," adding that "[i]t is my medical opinion that the claimant has a permanent disability." (Id.).

Finally, Dr. Hosain wrote that "I consider the patient disabled as a result of the accident of March 3, 2008," explaining as follows:

> The basis of my medical opinion that the patient is disabled is the fact that he is limited in his ability to bend at his lumbar spine, his limitations with regard

41

to lifting and his chronic lower back pain. This pain
has failed to resolve despite prolonged treatment
including interventional pain management treatments and
pharmacological treatments.

(Id.).

On November 11, 2011, Dr. Hosain wrote a second letter, to an
unnamed addressee, explaining that, since the March 3, 2008
accident, Mr. Salisbury "has not been able to continue in his
normal occupation as a landscaper." (Id. at 1052). Describing
plaintiff's limitations, Dr. Hosain wrote that "[h]e is unable to
bend his back without severe pain. He is not able to lift more
than about ten pounds weight without experiencing severe back pain.
The patient has to make frequent changes of position when sitting
or standing." (Id.).[73] Dr. Hosain concluded by writing that "[t]he
patient's prognosis is guarded at this time," although "he may
continue to experience pain for at least many years" and "is likely
to be unable to return to any physically demanding occupation."
(Id.).

---

[73] Dr. Hosain also wrote, without elaboration, that "[t]he patient has
increased with driving more than about 30 minutes." (Tr. 1052).

iv.  Treating Physician: Dr. Gurinder S. Mehar

The record also includes a number of reports and progress notes from various routine appointments and examinations by plaintiff's primary care physician, Dr. Gurinder S. Mehar.[74] Dr. Mehar saw plaintiff on July 9, 2008[75] (id. at 631), October 10, 2008 (id. at 632), October 29, 2008 (id. at 1050), January 15, 2009 (id. at 1049), March 12, 2009 (id. at 633), October 26, 2009 (id. at 1047),[76] June 28, 2010 (id. at 1046), October 26, 2010 (id. at 1044), October 27, 2010 (id. at 1045), April 12, 2011 (id. at 1043), and April 26, 2011. (Id. at 1042). None of these records are particularly informative with respect to the determinations at issue in this litigation.

---

[74] The record presents some confusion regarding when, exactly, plaintiff began seeing Dr. Mehar. On the one hand, in the 2009 RFC report that Dr. Mehar sent to the SSA, Dr. Mehar himself reports that he first saw plaintiff on March 7, 2008. (Tr. 528). Separately, in another form sent by plaintiff to the SSA, plaintiff recounts that his first visit with Dr. Mehar was indeed on March 7, 2008. (Id. at 528). Yet, in the hospital records from after plaintiff's March 3, 2008 accident, plaintiff was released into the care of Dr. Mehar, already identified as plaintiff's primary-care physician. (Id. at 655). Moreover, as early as May 2006, plaintiff's gastroenterology records were being forwarded to the attention of Dr. Mehar. (Id. at 709). Plaintiff obviously had some relationship with Dr. Mehar prior to his accident in 2008; and his and Dr. Mehar's representations to the contrary were, for some reason, erroneous.

[75] At this appointment, Dr. Mehar wrote that plaintiff weighed 397 pounds. (Tr. 631).

[76] At this appointment, at which plaintiff was complaining of a cold and was prescribed antibiotics, he appears to have been seen by a nurse practitioner affiliated with Dr. Mehar's office. (Tr. 1047). Several other records also appear to have been signed by the nurse practitioner (id. at 1045), or else at least not by Dr. Mehar himself. (See, e.g., id. at 1043-44).

On October 29, 2008, Dr. Mehar submitted an RFC report[77] to
the SSA. (Id. at 840-51). This report contains limited substance,
but notes a diagnosis of "[l]ower lumbar spine pain" and symptoms
of pain, difficulty walking, and difficulty sitting. (Id. at 841).
Calling plaintiff's prognosis poor[78] and mentioning plaintiff's
depression[79] (id at 842), Dr. Mehar provided some specific
feedback, in check-off format, about plaintiff's restrictions.
(Id. at 845-46). Dr. Mehar stated, inter alia, (1) that plaintiff
had no limitations on lifting or carrying -- but simultaneously,
and contradictorily, that plaintiff could only engage in this
activity "occasionally," (2) that plaintiff could only stand or
walk less than two hours per day, (3) that plaintiff could sit up
to six hours per day, and (4) that plaintiff was somehow limited
in his ability to push or pull. (Id.).

Dr. Mehar provided another RFC report in the wake of a January
12, 2009 appointment.[80] (Id. at 528-40). This submission was
slightly, although not significantly, more detailed. Dr. Mehar
provided a diagnosis of "[b]ack disc disease" and "pain" (id. at
528) and a prognosis of "poor." (Id. at 529). He noted plaintiff's

---

[77] Neither this nor the January 2009 report calls itself an "RFC" report.
The ALJ, however, refers to them as RFC reports (see Tr.49), a label we adopt.
    [78] Next to this prognosis and without elaboration, Dr. Mehar wrote "18-20
month." (Tr. 842).
    [79] Dr. Mehar also provided a few notations about plaintiff's "fatigue,"
which are too illegible to discern. (Tr. 843).
    [80] This report is otherwise undated.

"poor" mood and affect (<u>id.</u> at 534), depression, and fatigue, going so far as to write that the depression was "secondary to fatigue." (<u>Id.</u> at 529-30, 534). Dr. Mehar also wrote, with respect to plaintiff's work-related mental capacity, that plaintiff's ability for sustained concentration and persistence was "poor." (<u>Id.</u> at 537).

With respect to plaintiff's physical abilities, Dr. Mehar noted problems with "[a]ny walking sitting standing, lying" (<u>id.</u> at 530) and a significant abnormality in gait. (<u>Id.</u> at 532). Dr. Mehar repeated that plaintiff had "poor sitting-standing" (<u>id.</u> at 535) and noted that plaintiff was using a back brace to help him walk. (<u>Id.</u> at 531-32). Dr. Mehar concluded his report by making the following findings, mostly via check-off: (1) that plaintiff was limited in his ability to lift and carry, and could carry no more than "0" lbs, (2) that plaintiff could only stand or walk for less than two hours per day, (3) that plaintiff could only sit for less than six hours per day, and (4) that plaintiff was somehow limited in his ability to push or pull. (<u>Id.</u> at 536).

Given the Appeals Council's direct instruction to the ALJ to re-contact Dr. Mehar for clarification with respect to the above two reports (<u>id.</u> at 138), the ALJ sent a letter to Dr. Mehar's office on December 27, 2011. (<u>Id.</u> at 1058). ALJ Katz mentioned the

45

two reports and wrote that "I would appreciate it if you could provide the basis for those opinions and any medical records you might have for calendar years 2008 to the present time." (Id.). On January 3, 2012, this same letter was returned to the ALJ with the following handwritten information: "Please note: Dr. Mehar has retired." (Id.).

### v. Treating Physician: Dr. Todd Rochman

#### 1. Social Workers

On March 3, 2009, plaintiff began treatment at East Orange Psychiatric Associates, LLP ("East Orange"). (Id. at 988, 837-38).[81] As already discussed, at the hearings before ALJ Katz, plaintiff characterized his experience with East Orange as involving therapy sessions with social workers and visits with Dr. Todd Rochman, which generally focused on medication adjustment. (Id. at 73-74, 114). The records from East Orange generally accord with this description.

---

[81] The top of one of plaintiff's early intake forms for East Orange is dated February 28, 2009, although the bottom of this page was signed on March 3, 2009. (Tr. 988). In any event, plaintiff's first session at East Orange was on March 3, 2009. (Id. at 837-38).

Plaintiff appears to have first met with social worker Richard Sullivan, L.C.S.W. (Id. at 837-38). According to Mr. Sullivan's notes, plaintiff had been diagnosed with depression "5 YEARS AGO" (id.), which would place the diagnosis in early 2004. Mr. Sullivan confirmed that plaintiff had not sought treatment for his depression other than from his primary-care doctor and that this doctor had given plaintiff "ALL HIS MEDS." (Id.). For symptoms, Mr. Sullivan listed, inter alia, "NO INTERESTS," "HEAD FEELS FUZZY," "DUE TO THE PAIN DOESN'T GET MUCH SLEEP," "LOW CONCENTRATION," and "FORGETFULLNESS." (Id.). Plaintiff also acknowledged to Mr. Sullivan that he had considered self-harm in the past. (Id.). Mr. Sullivan also noted the various medications that plaintiff was then taking, including Wellbutrin, and observed that plaintiff "LOOKS SOMEWHAT DEPRESSED." (Id.).

In the first half of 2009, plaintiff met with Mr. Sullivan for a number of additional sessions. (Id. at 835-36).[82] In June 2009, however, plaintiff's therapy care appears to have been reassigned from Mr. Sullivan to another L.C.S.W. who signed her notes "MEB." (See id. at 828-34).[83] On June 3, 2009, plaintiff met

---

[82] For at least two of these appointments, another unnamed social worker appears to have conducted plaintiff's sessions. (Tr. 836 [notes for Apr. 28, 2009 & May 12, 2009]).

[83] We presume that MEB is a woman because, on May 20, 2009, plaintiff expressed a preference to Dr. Rochman for a "female therapist" (Tr. 835), which presumably precipitated this change.

47

with MEB, who noted plaintiff's depression "for six yrs," and wrote, inter alia, that the car accident in 2008 had increased plaintiff's depression. (Id. at 834). MEB also provided a diagnosis of "296.33" (id.), which is a "Major Depressive Disorder" in the Fourth Edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), further defined as "Severe Without Psychotic Features."

Appointments with MEB were recorded through the end of 2009 (id. at 832-33), including a June 10, 2009 entry that noted that plaintiff was "VERY DEPRESSED!" and regularly thought about death.[84] (Id. at 833). MEB also saw plaintiff numerous times in 2010. (Id. at 828-31). On March 3 and 10, 2010, MEB wrote out summaries of treatment and impressions of plaintiff, which she labeled as "disability documentation." (Id. at 828-31). MEB first summarized plaintiff's March 3, 2008 car accident and subsequent treatment for physical injuries. (Id. at 830). She then explained that plaintiff began attending East Orange "with symptoms of hopelessness, fatigue, isolation, helplessness, [and] suicidal ideation." (Id.).[85]

---

[84] This subject was raised consistently in these therapy sessions, most often -- but very clearly not always -- resulting in MEB noting that plaintiff denied suicidal or homicidal ideation. (See, e.g., Tr. 832 [notes from July 29 and September 16, 2009]; but see id. at 829 [notes from Mar. 23, 2010]).

[85] In plaintiff's memorandum in support of his motion, he quotes these notes and dates them to June 7, 2010. (Pl.'s Mem. 7). Although the East Orange notes, like many others in this thousand-page administrative record, are out-

MEB wrote that plaintiff "experienced depressive symptoms" in his early 30's, "caused by job loss & death of father." (Id.). She added that a "[p]sychiatrist prescribed wellbutrin & remeron" and that the wellbutrin "was sufficient until December 2008." (Id.). It was "[a]t that time [that] he sought help at [East Orange]." (Id.).

MEB concluded by writing that "[p]rior to [the] accident," plaintiff "reports depression, dysthymic[86] in nature," and that "within a reasonable degree of med[ical certainty,] eight month[s] after the auto accident, [Mr. Salisbury] developed symptom[s] of major depression related to medical condition[,] severe & recurrent." (Id.). She also wrote that "[w]ithin a degree of medical certainty[, Mr. Salisbury's] prognosis is uncertain" and that "[w]ithin a reasonable degree of certainty[, Mr. Salisbury] will continue to need psychiatric care to treat his depression as long as he is in pain & cannot provide for his family." (Id.).

---

of-order and difficult to parse, these notes quite clearly were written in March 2010, not June. (See Tr. 830). Plaintiff's misreading appears to stem from a handwritten observation in the margins of MEB's notes, in which she dates plaintiff's first visit with East Orange to "6-7 months after the accident." (Id. (emphasis added)).

    [86] "[D]ysthymic depression is chronic and must be consistently present for at least two years in adults, during which time the symptoms never become severe or numerous enough to warrant a diagnosis of major depression." 6 ATTORNEYS MEDICAL ADVISOR § 49:15.

Finally, there is another page of notes that appears on its face to be part of the March 2010 "disability documentation," but that is itself undated. (Id. at 828). On this page, MEB summarized plaintiff's work history by year, mentioning that he had never been injured on-the-job at any of his pre-accident jobs, going back to 1988. (Id.). She then wrote that, since the accident, plaintiff had "been completely disabled from performing his usual activities, both work related & family related," and that "[w]ithin a reasonable degree of med[ical] certainty, [Mr. Salisbury] is permanently disabled from work because of physical trauma & severe depression." (Id.). She concluded by essentially reiterating the same: "Within a reasonable degree of medical certainty this pt. Micah Salisbury is fully disabled." (Id.).[87]

## 2. Dr. Rochman

The record also contains numerous notations listing the various medications that plaintiff was prescribed or was taking on various dates, including Wellburtin, Zoloft, Trazodone, Abilify, and Ambien. (Id. at 839). Plaintiff appears to have had about ten medication appointments with Dr. Rochman per year, from 2009

---

[87] In addition to the three aforementioned social workers, one page of records, dated to August 20, 2011, lists a fourth, Wendy Afron, who was associated with plaintiff's care in some undescribed respect. (Tr. 452).

through 2011. (Id. at 829, 839, 989-91). On occasion, Dr. Rochman made more substantive notes, writing on May 20, 2009 that plaintiff "[c]ontinues to be depressed" and is "frequently tearful" (id. at 835), on June 2, 2009 that plaintiff's "[m]ood has been more stable" but that he was "[s]till not sleeping" (id.), on October 21, 2009, that plaintiff had a "[b]ad past week" and was "feeling lack of interest in things" (id. at 832), and on March 10, 2010, that plaintiff was experiencing "vague suicidal thoughts." (Id. at 830). However, on seemingly many more occasions, Dr. Rochman only adjusted plaintiff's medications without noting details of plaintiff's mental state. (See, e.g., id. [notes from April 21, 2009]).

On November 15, 2011, Dr. Rochman completed a "Mental Impairment Assessment." (Id. at 1053-56). In this assessment, Dr. Rochman echoed MEB's diagnosis of a "Major Depressive Disorder," pursuant to the DSM-IV, noting that plaintiff showed a "[m]arginal response to pharmacological efforts," although Dr. Rochman also noted that "[m]eds prevent suicidal thoughts/plans." (Id. at 1053). Describing plaintiff's prognosis as "[g]uarded," Dr. Rochman also responded to a prompt asking for "clinical findings . . . that demonstrate the severity of your patient's mental impairment and symptoms," by writing, inter alia, "[s]leep

disturbances," "[p]oor concentration," and "low energy." (Id. (emphasis in original)).

Via check-off responses, Dr. Rochman identified numerous "signs and symptoms," including (1) pervasive loss of interest in almost all activities, (2) decreased energy, (3) thoughts of suicide, (4) blunt, flat or inappropriate affect, (5) poverty of content of speech, (6) mood disturbance, (7) difficulty thinking or concentrating, (8) persistent disturbances of mood or affect, (9) emotional withdrawal or isolation, and (11) memory impairment. (Id. at 1054). Dr. Rochman also characterized plaintiff's restriction of activities of daily living as "moderate," his difficulties in maintaining social functioning as "extreme," and his deficiencies of concentration, persistence or pace as "marked." (Id. at 1055).[88] Dr. Rochman also indicated that plaintiff had "One or Two" episodes of decompensation[89] within a 12-month period, each of at least two weeks. (Id.).

---

[88] The form described these characterizations as follows:

Marked means more than moderate but less than extreme. A marked limitation m[a]y arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately, effectively, and on a sustained basis.

(Tr. 1055).

[89] The form described decompensation as follows:

Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily

Dr. Rochman stated, again via check-off, that he believed that plaintiff was suffering from "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." (Id.). Finally, Dr. Rochman estimated that plaintiff would be absent from work, on average, more than four times per month, stated that plaintiff was not a malingerer, and indicated that plaintiff's "impairment lasted or can [] be expected to last at least twelve months." (Id. at 1056).

### vi.  Treating Physician: Dr. Dean Cassimatis

There are a number of pages in the administrative record that relate to plaintiff's examinations for and treatment of his gastroenterological conditions. (See, e.g., id. at 673-711). These records, generally prepared by or for Dr. Dean Cassimatis. (see, e.g., id. at 675), are by and large irrelevant to this litigation. These records are notable, however, for two reasons. First, as

_____

living, maintaining social relationships, or maintaining concentration, persistence or pace. Episodes of decompensation may be demonstrated by an exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).

(Tr. 1055).

early as May 1, 2006, an intake form from Hudson Valley Gastroenterology Associates lists both Wellbutrin and Mirtazapine among plaintiff's medications. (Id. at 710). Second, as early as May 22, 2006, Dr. Cassimatis's reports were being forwarded to Dr. Mehar. (Id. at 709).

### vii. Examining Physician: Dr. Sunitha Polepalle

Dr. Sunitha Polepalle performed an "independent medical examination," after which she produced a report dated October 3, 2008. (Id. at 668-72). Board certified in physical medicine and rehabilitation, as well as in pain management (id. at 670-72), Dr. Polepalle began her report by describing plaintiff's symptoms. (Id. at 668). Among other details, she noted that plaintiff stated that "[s]itting alleviates some of his pain." (Id.). Somewhat contradictorily, she also observed that "[a]ny type of activity, bending, pushing, pulling, lifting, standing, walking, sitting aggravates his symptoms." (Id.). She explained that "[s]tanding and sitting for more than 10 to 15 minutes aggravates his symptoms." (Id.).[90]

---

[90] Among Dr. Polepalle's other observations regarding plaintiff's medical history, she noted that "[h]e has seen Dr. Hossain for pain management and has not received any injections thus far." (Tr. 668). Those injections began less than a week later. (Id. at 822-27). We also note that Dr. Polepalle stated that his medical history was "[s]ignificant for depression and anxiety in the past for many years." (Id. at 668).

Dr. Polepalle examined plaintiff and observed, <u>inter</u> <u>alia</u>, that he was overweight, she stated that "[g]ait, heel walking and toe-walking are within normal limits," and made some notations about plaintiff's range of motion and reflexes. (<u>Id.</u> at 669). She also reviewed Dr. Hosain's notes and the MRI results, and characterized plaintiff's treatment as of that date as "appropriate . . . for myofascial pain in the low back." (<u>Id.</u>; <u>see</u> <u>also</u> <u>id.</u> at 670).

Although plaintiff had seen Dr. Hosain as recently as late July and late August 2008 (<u>id.</u> at 753-54) -- and had ongoing physical therapy prescribed by Dr. Levin at the March 25, 2008 appointment (<u>id.</u> at 646) -- <u>and</u> although Dr. Polepalle stated that this ongoing treatment was "appropriate" (<u>id.</u> at 669), she also stated that "[t]he patient had [only] a temporary impairment for approximately two months as a result of the injuries obtained in the March 3, 2008 accident" (<u>id.</u> at 670), a timeframe that implies that Dr. Polepalle believed that plaintiff no longer suffered from any type of impairment as of early May 2008.

Dr. Polepalle further stated that she "believe[s] that the patient is able to return to previous activities including his work and doing some housekeeping" and that "[t]he patient's condition has stabilized relative to the injury sustained in the

March 3, 2008 accident." (Id.).[91] This was despite Dr. Polepalle's observation that "[t]he patient states that he has a history of depression and anxiety for many years which can affect his recovery from the conditions of his back pain due to myofascial pain." (Id.).

Ultimately, Dr. Polepalle diagnosed Mr. Salisbury as suffering (or as having suffered) from "myofascial pain in the back," stating that his "prognosis is good." (Id. at 670). She concluded that Mr. Salisbury did not need "any further treatment with regards to the March 3, 2008 accident." (Id.).[92]

### viii.   Examining Physician: Dr. Jeffrey W. Degen

In the summer of 2010, plaintiff twice met with and was examined by Dr. Jeffrey W. Degen, which resulted in reports being issued to Dr. Mehar. (Id. at 1007-13). First, on July 23, 2010, Dr. Degen reported that "[t]he worst of [Mr. Salisbury's] pain is in the back itself." (Id. at 1009). Dr. Degan elaborated that "[i]f the patient sits or stands in one position, the pain comes on" and

---

[91] Dr. Polepalle did note that "[t]he patient states that he has not reached preinjury status, however." (Tr. 670). Dr. Polepalle did not accept this statement. (Id.).

[92] This letter quite obviously triggered the initial decision by plaintiff's insurance carrier not to cover his trigger point injections (see Tr. 750), a decision that was likely ultimately reversed. See supra p. 38 n.70.

that "[i]t recently has begun to radiate through the medial aspects of the thighs and legs, down to the feet." (Id.). Dr. Degan performed an examination of plaintiff and reviewed both the hospital X-rays and the April 2008 MRIs, deeming the latter of "fairly poor quality" and ordering new scans. (Id. at 1009-10).

These new MRIs, of both the lumbar and cervical spines, were conducted on August 3, 2010. (Id. at 1012-13). On August 13, 2010, Dr. Degen held a follow-up appointment with plaintiff and wrote a second report to Dr. Mehar, in which he interpreted the MRIs as follows: "The cervical spine is essentially a normal study. The lumbar spine study does demonstrate some degenerative changes and mild neuroforaminal stenosis at L5-S1 and possibly L4-5 without nerve root impingement. There are no lesions on Mr. Salisbury's MRI scans that would be amenable to surgical correction." (Id. at 1007). Dr. Degen concluded by writing that "[h]opefully, Dr. Hosain will be able to find a medication or procedure that will alleviate Mr. Salibury's symptoms." (Id.).

ix.  Other Relevant Record: Single Decision-Maker Assessment

Also contained in the record is an RFC assessment, dated April 29, 2009, completed by A. DelNero, an SSA "Single Decision-Maker"

("SDM"). (Id. at 634-39).[93] Plaintiff was diagnosed with a "back disorder" (id. at 634) and assessed, mostly via check-offs, as having the following exertional abilities: (1) ability to occasionally lift or carry twenty pounds, (2) ability to frequently lift or carry ten pounds, (3) ability to stand and/or walk "with normal breaks" for about six hours in an eight hour workday, (4) ability to sit for a total of about six hours in an eight hour workday, and (5) an unlimited ability to push or pull, other than the above-mentioned lifting and carrying limitations. (Id. at 635).[94] The SDM also found that Mr. Salisbury could "occasionally" climb a ramp, stairs, a ladder, rope, and scaffolds, as well as "occasionally" balance, stoop, crouch, and crawl. (Id. at 636). He found that plaintiff could "frequently" kneel. (Id.).

The SDM explicitly noted that Dr. Mehar's assessments -- that plaintiff could not even lift "0" pounds and could sit for only less than six hours per day and stand for less than two hours per day -- are "significantly different" from his findings. (Id. at 638). The SDM stated that Dr. Mehar's notes "provide little in the way of objective findings" and are "not consistent with the

---

[93] Single decision-makers often "make the initial determination [of disability] with assistance from medical or psychological consultants, where appropriate." 1 Soc. Sec. Disab. Claims Prac. & Proc. § 15:45 (2d ed.) (2014).

[94] The SDM appears to ground these assessment in the 2008 and 2009 records from Dr. Hosain. (Tr. 635).

available medical evidence and . . . not given controlling weight."
(Id.).


x.  Other Relevant Record: Function Report


On March 16, 2009, plaintiff submitted a "function report" to
the SSA. (Id. at 605-615). Plaintiff described his limitations in
some detail. With respect to childcare, plaintiff represented that
while he does "take care of my children, feed them their meals and
watch them play," he also spends most of his day "in the recliner
because I have the least amount of pain there." (Id. at 606).


More specifically, he "[g]et[s] breakfast for kids," but "it
takes everything to feed them." (Id.). During the day, "[s]omeone
comes to put the babies down for a nap," and also "comes to help
dress and change the babies." (Id.). Plaintiff's wife "prepares
all food for me and children"[95] and, when she returns from work at
3:00 pm, she "takes over all duties for children, dinner,
housecleaning, etc." (Id.). Before the accident, plaintiff wrote,
"I also could stand long enough to change and dress the kids," but

---

[95] Somewhat contradictorily, plaintiff also wrote that he "[p]repare[s]
lunch" for himself. (Tr. 606). Elsewhere, he elaborated that he is able to
prepare "[a]nything that can be microwaved," but that "[i]t is difficult for me
to stand and cook in the kitchen" and that "I eat a lot more frozen and fast
foods because it is hard for me to prepare food." (Id. at 607).

that "I cannot play/interact with them as I previously had done because of the pain I am in." (Id.).

With respect to other activities, plaintiff wrote, inter alia, that he is unable "to shower on a regular basis" (id.), is able to "[p]ut dishes away" (id. at 608), and is able to drive or ride in the car, but that he can go "[o]nly short distances" and, beyond places "I need to go," he does not go outside because of pain or discomfort. (Id. at 608). Plaintiff also acknowledged that he is able to shop online and "[i]n stores," but only does the latter for "[g]ifts for wife" and only "for a holiday gift" because of "pain and the need to stop and rest frequently." (Id. at 609).[96] In sum, plaintiff wrote that while he "can use hands, see, hear and talk[,] I cannot lift, stand, walk, sit, climb stairs, kneel, squat or reach for any length of time because I experience immediate pain and discomfort" (id. at 609), and that he is "unable to care for myself and family [and] rely on my wife for everything." (Id. at 615).

---

[96] Other topics included handling money -- which plaintiff said that he can do, although "I am more forgetful and unable to sit for a long period of time to balance accounts" (Tr. 609) -- watching television -- which plaintiff does every day, in the recliner, "because it is the least painful position for me" (id.) -- and walking -- which plaintiff stated that he can engage in for approximately 1/8 of a mile before having to stop and rest for about 5-10 minutes. (Id. at 611).

This form also asked plaintiff to describe his mental state and various related symptoms. (Id. at 609, 611-12). With respect to social activities, plaintiff "do[esn't] feel like going out much due to change in emotions (depression) and I also don't go out to restaurants because it is very uncomfortable to sit." (Id. at 609). He attested to being "unable to focus on conversations or to remember facts," although he agreed that he is able to "finish what [he] start[s]" and can follow spoken and written directions. (Id. at 611). He stated that he "do[es] not handle [stress or changes in schedule] well," that he "shut[s] down," and that he has trouble remembering "[e]ven basic things, tasks, [and] upcoming events." (Id. at 612).

Finally, plaintiff addressed his pain (id. at 613-14), which he wrote had worsened over time. (Id. at 614). He listed various of his medications and their doses and wrote that some or all of them have the side effects of making him "[s]leepy, groggy, forgetful." (Id.).

III. General Standards for Disability Insurance Benefits Eligibility

In order to qualify for disability insurance benefits and SSI, a claimant must demonstrate that he was disabled as of a date

61

on which he was still insured. See, e.g., Arnone v. Bowen, 882 F.2d 34, 37 (2d Cir. 1989) (citing 42 U.S.C. § 423(a)(1)(A)); Feliciano v. Colvin, 2015 WL 1514507, *1 n.1 (S.D.N.Y. Mar. 31, 2015); Fleming v. Astrue, 2010 WL 4554187, *9 (E.D.N.Y. Nov. 2, 2010). For purposes of eligibility for benefits, an applicant is "disabled" within the meaning of the Act if he is unable "'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months.'"[97] McIntyre v. Colvin, 758 F.3d 146, 149–50 (2d Cir. 2014) (quoting 42 U.S.C. § 423(d)(1)(A)).

The Act requires that the relevant physical or mental impairment be "'of such severity that [plaintiff] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008) (quoting 42 U.S.C. § 423(d)(2)(A)). If the claimant can perform substantial gainful work existing in the national economy, it is immaterial, for the purposes of the Act, that an opening for such work may not

---

[97] "Substantial gainful activity" is defined as work that "[i]nvolves doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510; see also Flanigan v. Colvin, 21 F. Supp. 3d 285, 300 (S.D.N.Y. 2014); Calzada v. Astrue, 753 F. Supp. 2d 250, 267 n.39 (S.D.N.Y. 2010).

be found in the immediate area where he lives or that a specific
job vacancy may not exist. Butts v. Barnhart, 416 F.3d 101, 107
(2d Cir. 2004) (quoting 42 U.S.C. § 423(d)(2)(A)).

In assessing a claim of disability, the Commissioner must
consider: "(1) objective medical facts; (2) diagnosis or medical
opinions based on those facts; (3) subjective evidence of pain and
disability testified to by claimant and other witnesses; and (4)
the claimant's background, age, and experience." Williams ex rel.
Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988). The SSA
regulations set forth a five-step sequential process under which
an ALJ must evaluate disability claims. 20 C.F.R. §§
404.1520(a)(4)(i)-(v), 416.920. The Second Circuit has described
this sequential process as follows:

> "First, the Secretary considers whether the claimant is
> currently engaged in substantial gainful activity. If he
> is not, the Secretary next considers whether the
> claimant has a "severe impairment" which significantly
> limits his physical or mental ability to do basic work
> activities. If the claimant suffers such an impairment,
> the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed
> in Appendix 1 of the regulations. If the claimant has
> such an impairment, the Secretary will consider him
> disabled without considering vocational factors such as
> age, education, and work experience; the Secretary
> presumes that a claimant who is afflicted with a "listed"
> impairment is unable to perform substantial gainful
> activity. Assuming the claimant does not have a listed

impairment,[98] the <u>fourth</u> inquiry is whether, despite
the claimant's severe impairment, he has the residual
functional capacity to perform his past work.[99]
<u>Finally</u>, if the claimant is unable to perform his past
work, the Secretary then determines whether there is
other work which the claimant could perform." The burden
of proving disability, encompassing the first four of
these steps, is on the claimant. The burden of proving
the fifth step is on the Secretary.

<u>Bush</u>, 94 F.3d at 44-45 (emphasis in original) (quoting <u>Rivera v.</u>
<u>Schweiker</u>, 717 F.2d 719, 722-23 (2d Cir. 1983)); <u>see also</u> <u>Poupore</u>
<u>v. Astrue</u>, 566 F.3d 303, 306 (2d Cir. 2009).

At the fourth step, which requires determining the RFC, if a
claimant has more than one impairment, all medically determinable
impairments must be considered, including those that are not
"severe." 20 C.F.R. § 404.1545(a)(2). The assessment must be based
on all relevant medical and other evidence, such as physical

---

[98] If a claimant has a "listed" impairment, he will be considered disabled
<u>per se</u> without an additional assessment of vocational factors such as age,
education, and work experience. If the plaintiff does not have a listed
impairment, the Commissioner must consider plaintiff's residual functional
capacity, which is his ability to do physical and mental work activities on a
sustained basis, despite limitations from her impairments. <u>See</u>, <u>e.g.</u>, <u>Bush v.</u>
<u>Shalala</u>, 94 F.3d 40, 44-45 (2d Cir. 1996). With respect to mental disorders, to
determine whether the applicant has a listed disorder, the ALJ must consult the
relevant criteria for each listing. "The criteria in paragraph A substantiate
medically the presence of a particular mental disorder" while "[t]he criteria
in paragraphs B and C describe impairment-related functional limitations that
are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404,
Subpt. P, App. 1, § 12(A) ("Appendix 1").

[99] Residual functional capacity ("RFC") is a claimant's maximum remaining
ability, despite her limitations, "'to do sustained work activities in an
ordinary work setting on a regular and continuing basis, and the RFC assessment
must include a discussion of the individual's abilities on that basis.'"
<u>Michaels v. Colvin</u>, 2014 WL 641463, *18 (S.D.N.Y. Feb. 18, 2014) (quoting
<u>Melville v. Apfel</u>, 198 F.3d 45, 52 (2d Cir. 1999)).

abilities, mental abilities, and symptomology, including pain and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a)(1)-(3).

Normally, in meeting her burden on the fifth step, the Commissioner may rely on the Medical-Vocational Guidelines contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, commonly referred to as "the Grid[s]."[100] Zorilla, 915 F. Supp. at 667.

> When the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect only your ability to meet the strength demands of jobs . . ., we consider that you have only exertional limitations. When your impairment(s) and related symptoms only impose exertional limitations and your specific vocational profile is listed in a rule contained in appendix 2, we will directly apply that rule to decide whether you are disabled.[101]

---

[100] "The Grid classifies work into five categories based on the exertional requirements of the different jobs." Andrews v. Colvin, 2014 WL 3630668, *16 n.7 (S.D.N.Y. July 22, 2014) (quoting Zorilla v. Chater, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996)). "Specifically, it divides work into sedentary, light, medium, heavy, and very heavy, based on the extent of the requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." Id. Based on these factors, the SSA uses the Grids to evaluate whether the claimant can engage in any other substantial gainful work that exists in the economy. Zorilla, 915 F. Supp. at 667.

[101] "Limitations are classified as exertional if they affect your ability to meet the strength demands of jobs. The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertional levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling." 20 C.F.R. § 416.969a(a). All other limitations are considered non-exertional. See, e.g., Rosa v. Callahan, 168 F.3d 72, 78 n.2 (2d Cir. 1999); Samuels v. Barnhart, 2003 WL 21108321, *11 n.14 (S.D.N.Y. May 14, 2003) (quoting 20 C.F.R. § 416.969a(a)); see also 20 C.F.R. § 404.1569a(c).

20 C.F.R. § 416.969a(b). However, if a claimant suffers from significant non-exertional limitations, exclusive reliance on the Grids is inappropriate. See Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004 (citing Rosa, 168 F.3d at 78); see also Feliciano v. Apfel, 242 F.3d 364, *1, 2000 WL 1775513, *1 (2d Cir. 2000); Lugo v. Colvin, 2014 WL 5045630, *1 (S.D.N.Y. Oct. 9, 2014).

The Second Circuit has consistently emphasized the importance of the Commissioner's burden to support her step-five determination with substantial evidence, and has held that a reversal with a remand only to calculate damages is warranted when the ALJ has failed to meet that burden. Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000) (holding that no purpose would be served by remanding the case for rehearing where the ALJ's finding of the claimant's RFC was not supported by substantial evidence); Rosa, 168 F.3d at 80-81 (holding that the ALJ could not rely on consulting expert reports when those reports were silent on the subject of the claimant's exertional capability, and therefore remanding for damage calculations); Balsamo v. Chater, 142 F.3d 75, 82 (2d Cir. 1998) (remanding an appeal for calculation of damages because the record did not support the ALJ's RFC determination and finding it unlikely that the Commissioner could produce new and material evidence, or could show good cause for having failed to produce substantial evidence in the original

66

proceeding); Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 643-44 (2d Cir. 1983) (holding that a rehearing was not needed when the failure to sustain the burden at step five is the sole reason for remand, that four years had elapsed since the claimant applied for benefits, and that a rehearing would only delay the benefits likely due to the claimant). Nonetheless, remanding only for benefits calculation "is an extraordinary action and is proper only when further development of the record would serve no purpose." Baldwin v. Astrue, 2009 WL 4931363 (S.D.N.Y. Dec. 21, 2009) (citing Rivera v. Barnhart, 379 F. Supp. 2d 599, 604 (S.D.N.Y. 2005)).

## IV.  The ALJ's Second Decision

On January 17, 2012, ALJ Katz issued a second decision, finding that plaintiff was not disabled within the meaning of the Act. (Tr. 37-59).[102] Given plaintiff's claim of disability from the

---

[102] The ALJ's first decision is in large measure identical in substance, if not often in exact wording, to the second decision. (See Tr. 121-36). Hence, our summary of the record focuses on the ALJ's second decision, which in any event was the subject of plaintiff's second application for review to the Appeals Council and thus this litigation.

Nevertheless, we briefly observe that the first decision differs from the second in three general respects: First, the ALJ addressed a dispute about plaintiff's date last insured, which was later resolved by the issuance of the second decision. (See id. at 124). Second, the ALJ left the determination that plaintiff had not engaged in substantial gainful activity entirely unqualified. (Id. at 126). Finally, the ALJ relied exclusively on a Grids determination to find plaintiff not disabled, without further elaboration or support from the DOT or a vocational expert. (Id. at 132-32).

date of his accident and his date last insured, the ALJ articulated
the "threshold issue [as] . . . the status of the claimant's
medical condition between March 3, 2008 and December 31, 2008."
(<u>Id.</u> at 41).[103]

At step one of the required analysis, the ALJ determined that
during the period at issue, "[t]he claimant did not engage in
substantial gainful activity." (<u>Id.</u> at 43).[104]

---

[103] The record reflects some initial lack of clarity over plaintiff's date
last insured. (<u>See</u> Tr. 41, 98, 101, 116-17). As mentioned, this issue was
addressed in the ALJ's first decision. (<u>Id.</u> at 124). However, this confusion
appears to have been resolved by the date of the second hearing, at which all
parties agreed that December 31, 2008 was the cut-off. (<u>Id.</u> at 75).

[104] In contrast with the ALJ's first decision, in which he arrived at this
conclusion without qualification (<u>see</u> Tr. 126), in this second decision, he
engaged in a somewhat lengthy discussion of the landscaping business co-owned
by plaintiff and his wife. (<u>Id.</u> at 43).

Despite an affidavit from plaintiff's wife that she was "operating **all
aspects**" of the business subsequent to March 3, 2008 and plaintiff's testimony
to that affect, "[t]he ALJ does not find it likely that a full-time teacher and
the operator of another business [which plaintiff's wife was also apparently
engaged in] would be capable of **solely** running a business that previously
required her spouse's **full attention**." (<u>Id.</u> (all bold emphases here and
elsewhere from ALJ's decision)). The ALJ found this conclusion "buttressed by
the claimant's own testimony at Hearing II" at which plaintiff "consistently
stated that 'I' did this or that," even though "the claimant's attorney had him
'clarify' this testimony at Hearing II by having him state that **his wife** actually
did these tasks." (<u>Id.</u>).

We note that several of the ALJ's characterizations of plaintiff's
testimony are incorrect. Simply put, plaintiff's testimony was not "consistent,"
given that plaintiff repeatedly explained that it was his wife who was handling
even the administrative tasks. Contrary to the ALJ's apparent read of the
transcript as reflecting that plaintiff only clarified his position when pressed
by his attorney, plaintiff explained that his wife was the administrative
operator of the business (1) when the ALJ inquired about the subject (<u>id.</u> at
71), (2) on his own volition at the first hearing (<u>id.</u> at 116), (3) on his own
volition at the second (<u>id.</u> at 83), and (4) yes, after his attorney again asked
him to further clarify. (<u>Id.</u>).

Nevertheless, the ALJ explained that he "g[o]t the distinct impression
from the claimant's overall testimony and the medical record that the claimant
would have been capable of performing some administrative tasks associated with

At step two of the analysis, ALJ Katz concluded that plaintiff had two severe impairments: a "spinal impairment" and "obesity." (Id. at 44).[105]

The ALJ also devoted a substantial portion of his decision to discounting plaintiff's "[a]lleged mental illness" (Id. at 44-46), writing that "[a]lthough the claimant testified to a history of 'disabling' depression, the documentation relevant to the **period at issue** do[es] not corroborate this assertion." (Id. at 44).

First, the ALJ noted that Dr. Mehar's records from July 9, 2008, October 10, 2008, and March 12, 2009 "noted no abnormalities in the claimant's mental functioning." (Id.). The ALJ acknowledged that, on January 12, 2009, Dr. Mehar wrote that Mr. Salisbury suffered from "poor" concentration and had a "depressed" attitude (id. (citing id. at 534)), but the ALJ minimized these observations because, inter alia, (1) no "objective" findings were included along with this assessment, (2) Dr. Mehar is not a psychiatrist, (3) Dr. Mehar "**did not specifically** diagnose the patient with a

---

the business, even though he might not have been **physically** able to perform all aspects of the business." (Id. at 43). However, because he could not "conclusively determine that claimant's work activity reached SGA levels in calendar year 2008," the ALJ found that Mr. Salisbury satisfied his burden under the first step of the required analysis. (Id.).

[105] The ALJ noted that, despite plaintiff's history of hypertension, diabetes, and ulcerative colitis, those conditions appeared under control and plaintiff has not alleged disability based in whole or in part on these conditions. (Tr. 46-47).

depressive disorder," (4) no psychotropic medications were prescribed "at that time," and (5) Dr. Mehar "found that orientation, memory and concentration ability were 'ok'" and that Mr. Salisbury could "perform calculations and serial 7's." (Id. at 44 & n.3).[106]

With respect to the records from East Orange,[107] the ALJ first noted that plaintiff had only begun treatment at this facility on March 3, 2009, "**after** the claimant's date last insured." (Id. at 45). Indeed, according to the ALJ, because Mr. Salisbury "was not seen by Dr. Rochman until **after** the date last insured[,] there is no logical way the physician could retrospectively attribute the

---

[106] The ALJ also emphasized that, according to Dr. Hosain's notes dated June 24, July 30, and August 27, 2008, Mr. Salisbury's mood and affect were normal and he was oriented times three. (Tr. 44).

[107] At one point, the ALJ noted that "Dr. Rochman does not identify himself as a psychiatrist, but he is associated with East Orange Psychiatric Associates" (Tr. 46), presumably implying some question about his qualifications. Dr. Rochman's biography, easily discoverable online, is as follows:

> Dr. Todd Rochman, MD received his Psychiatric training at St Luke's Roosevelt Hospital Center in NYC as a Fellow of the Columbia University College of Physicians and Surgeons. Dr Rochman is a Diplomat of the American Board of Psychiatry and Neurology and a long standing member of The American Psychiatric Association. In 1987 he moved to the Hudson Valley and began his career in mental health. Dr. Rochman has practiced in virtually every corner of the field including but not limited to; Attending Psychiatric Staff for fifteen years at St Francis Hospital in Poughkeepsie NY. Twenty years of Forensic Consultative services for the Dutchess County Department of Mental Health. Six years serving as Chairman and Chief of Psychiatry at St Luke's Cornwall Hospital in Newburgh NY. Dr. Rochman has expertise in Adult and Adolescent care treating all mental health needs. As a board certified Psychopharmacologist, Dr. Rochman is available to provide Assessments and Medication management for all EOPA patients.

MEET THE EAST ORANGE PSYCHIATRIC HEALTH CARE TEAM, http://eopapsych.com/about-eopa/ (last visited Aug. 13, 2015).

consequences of depression to an earlier point in time." (Id. at 46).[108]

Turning to the content of the East Orange records, ALJ Katz characterized "the treating notes from March 2009 through July 2009 (i.e., subsequent to the date last insured but close to that point in time)" as not "set[ting] forth **any specific limitations in mental functioning.**" (Id. at 45). On this point, the ALJ emphatically concluded that "[t]here were no findings . . . that the claimant had any mental difficulties with normal activities of daily living, social activities or focus/concentration," and that "claimant was apparently able to concentrate well enough to drive a motor vehicle and care for his small children while his wife worked full time." (Id. at 45).

The ALJ characterized the social worker's determination that Mr. Salisbury was "fully disabled" as a "conclusory finding by a

---

[108] The ALJ repeatedly turns to this motif of chronology, noting, inter alia, (1) that "[t]he claimant did not seek out formal psychiatric care until the spring of 2009- **well subsequent** to his date last insured" (Tr. 44), (2) that a disability determination by an East Orange social worker was "[b]ased on discussions in **2010**" and conclusions arrived at "several years after the claimant's date last insured" (id. at 45), (3) that Dr. Rochman's November 15, 2011 letter was provided "many years **after** the claimant's date last insured" (id. at 46), that (4) "treatment prior to the date last insured was limited to routine psychotropic medications . . . occasionally prescribed by the claimant's general doctor (Dr. Mehar), who did not report any significant mental health symptoms in calendar year 2008" (id.), and that (5) Dr. Rochman "only saw the claimant every 2-3 months and relied on treating notes to formulate []his opinion, but the treating notes **do not** corroborate the intensity of mental debilitation reported **until July 2010**." (Id.).

71

'non-acceptable' medical source" (id. at 45)[109] and characterized
Dr. Rochman's November 15, 2011 opinion as "given in 'check off'
format" and not "set[ing] forth any underlying rationale for the
conclusions reached." (Id. at 46).

In sum, while acknowledging that "[t]he record does show a
history of depression," the ALJ concluded that "[p]resumably, the
claimant's depression was adequately controlled" in 2008 and
"[a]ccordingly, the ALJ gives no evidentiary weight to Dr.
Rochman's 2011 opinion." (Id.). Instead, ALJ Katz gave "greater
evidentiary weight to the contemporaneous treating notes of
treating sources in 2008 [and 2009]," which he characterizes as
"more reliable since they were created for the purposes of
**treatment** -- not for the sole purpose of assisting the claimant
with his claim for disability." (Id.). The ALJ therefore concluded
that "the claimant did not have a severe mental impairment that is
objectively documented on or prior to the date last insured."
(Id.).[110]

---

[109] This was the March 2010 social worker record, written by MEB, which
plaintiff's attorney drew particular attention to at the second hearing. (See
Tr. 70-72).
[110] "At best," the ALJ wrote, "the evidence shows the possibility of only
'mild' deficits in concentration ability which would have had only a very
minimal adverse impact on the claimant's ability to perform basic work
activities." (Tr. 46). The ALJ demonstrates this, in part, by explaining -- in
accordance with the ALJ's impressions -- that Mr. Salisbury was "mentally able
to **continue the business** by hiring other people to work for him during calendar
year 2008," which, according to the ALJ, "shows that the claimant had sufficient
mental ability during calendar year 2008 to operate a business (with the

For step three of the required assessment, the ALJ concluded that Mr. Salisbury was not suffering from one of the <u>per se</u> "listed" impairments in Appendix 1, first stating that "[a] review of the medical documentation fails to show the presence of abnormalities that are comparable in severity to the criteria as set forth in listing 1.00." (<u>Id.</u> at 47).[111] Second, repeatedly citing his "above"-discussed assessment of plaintiff's asserted mental dysfunction, the ALJ held that the severity of plaintiff's claimed mental impairment "did not meet or medically equal the criteria of listing 12.04." (<u>Id.</u>).[112] The ALJ did not address whether he found plaintiff to have met the requirements of

---

assistance of his wife) and generally interact appropriately with customers and employees that he hired to perform the physical work." (<u>Id.</u> at 45).

[111] Generally, listing 1.00 covers "[d]isorders of the musculoskeletal system." Appendix 1, Listing 1.00(A).

[112] Listing 12.04 covers "Affective Disorders," which are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." The required level of severity for 12.04 impairments requires satisfying either <u>both</u> paragraphs A and B <u>or</u> paragraph C, the ALJ's discussion of which we turn to next.

paragraph A.[113] However, the ALJ found that neither the criteria of paragraph B[114] nor those of paragraph C[115] were satisfied. (Id.).

With respect to step four, the ALJ concluded that plaintiff was unable to perform his past work. (Id. at 51). In so concluding, the ALJ summarized his findings regarding plaintiff's RFC:

> The claimant has the residual functional capacity to perform a full range of sedentary exertion level work as defined in 20 CFR 404.1567(a). The claimant had the ability to sit for 8 hours and stand/walk for 4 hours during the course of an 8-hour workday; and he was able to lift/carry items weighing 10 pounds. Despite his back impairments, he is able to bend occasionally (i.e., one-third of the time during a typical work day). The claimant was not able to perform highly aerobic work activity due to his overweight condition.

(Id. at 47; see also id. at 51).[116] To arrive at this RFC, the ALJ undertook a two-step assessment of the evidence. (Id. at 48).

---

[113] Given the ALJ's immediate mention of paragraph B, he presumably found plaintiff to have met the conditions under paragraph A, which, for a "[d]epressive syndrome," require showing "at least four" of a list of nine touchstones of depression. Appendix 1, Listing 12.04(A)(1)(a-i).

[114] Paragraph B requires the impairment to result in at least two of the following: "(1) Marked restriction of activities of daily living; or (2) Marked difficulties in maintaining social functioning; or (3) Marked difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation, each of extended duration." Appendix 1, Listing 12.04(B). According to the ALJ, plaintiff "had no restriction in his ability to perform activities of daily living." (Tr. 47). The ALJ also found that "the claimant had no difficulties" with respect to his social functioning. (Id.). The ALJ determined that Mr. Salisbury "had only minimum ('mild') difficulties" in his "concentration, persistence or pace" and that he "experienced no episodes of decompensation." (Id.).

[115] Paragraph C requires a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," and one of three additional criteria. Appendix 1, Listing 12.04(C).

[116] The ALJ elsewhere acknowledged that "[t]he claimant has a serious back impairment that was, no doubt, made worse by his overweight condition." (Tr.

First, he determined "whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms." (Id.). Second, he "evaluate[d] the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning," and "ma[d]e a finding on the credibility of the statements based on a consideration of the entire case record" when such statements were "not substantiated by objective medical evidence." (Id.).

The ALJ first assessed the records from Dr. Levin. (Id. at 48-49). In sum, the ALJ found that Dr. Levin's April 16 and April 30, 2008 statements that plaintiff was "out of work until further notice" could "not be accepted as determinative." (Id. at 48 (quoting id. at 648-49, 652)).[117] The ALJ discounted this evidence because (1) Dr. Levin is not a vocational expert, (2) these statements were "obviously referable" to plaintiff's landscaping

---

50). The ALJ then explained "however, [that] this would not have prevented the claimant from engaging in 'sedentary' types of activities nor would it prevent him from walking short distances, such as in an 'office' environment." (Id. at 50-51). Seemingly as proof of this assessment, the ALJ noted that "[t]he claimant reported to his pain management physician that pain was exacerbated **only** when lifting more than 5-10 pounds." (Id. at 51 (citing id. at 718)).

[117] The ALJ's assessment of these statements by Dr. Levin was responsive to the Appeals Council's instructions that he further evaluate the significance of these records. (See Tr. 138).

work,[118] and (3) the "'opinions' were not repeated at any later
time." (Id. at 48).

Next, the ALJ discussed the records from Dr. Hosain. (Id. at
49). The ALJ noted that Dr. Hosain's March 6, 2010 determination
that plaintiff was "unable to work **at his regular occupation**" did
not inform on plaintiff's ability to work other jobs. (Id. at 49
n.9 (quoting id. at 719); see also id. at 51).[119] The ALJ also drew
particular attention to a March 17, 2009 record -- "close to [2008]
in time" -- that, according to the ALJ, "found only minor
abnormalities." (Id. at 50 (citing id. at 557)).

The ALJ also addressed the October 3, 2008 IME conducted by
Dr. Polepalle, emphasizing that "[t]he claimant's prognosis was
considered to be good" and that Dr. Polepalle had opined that, as
of October 2008, "the claimant was able to return to his previous
activities that included his work as a landscaper." (Id. at 49
(citing id. at 670)).[120] The ALJ also acknowledged that Dr.

---

[118] The ALJ once again added that, with respect to the landscaping business,
plaintiff "was . . . able to co-manage the 'non-physical' aspect of the business
with his wife." (Tr. 48 n.8).
[119] The ALJ similarly characterized Dr. Hosain's November 11, 2011 finding
that plaintiff could not return to some "physically demanding occupation." (Tr.
49 (quoting id. at 1052)). With respect to this record, the ALJ also noted that
Dr. Hosain had found that plaintiff "could not lift **more than** 10 pounds of
weight." (Tr. 49 (citing id. at 1052)).
[120] The ALJ also called attention to Dr. Polepalle's notes that reflected
that plaintiff had stated that "[s]itting alleviates some of his pain," as well
as the seemingly contradictory fact that plaintiff apparently reported that

Polepalle had noted a past history of depression "for many years," but the ALJ also minimized this finding because "no current symptoms were identified or were considered limiting." (Id.).

Turning to the records from Dr. Mehar, the ALJ referenced only the "check-off" RFC evaluations dated October 29, 2008 and approximately January 12, 2009. (Id. at 49-50).[121] The ALJ noted that, in the earlier record, "Dr. Mehar (a general practitioner) opined that the claimant could **sit up to six hours** but could stand/walk less than two hours per day . . . however, he gave no specific basis for these conclusions." (Id. at 49 (citing id. at 846)). The ALJ also noted that the later assessment "estimated that the claimant could sit for **less than six hours** per day but, again, provided no reason for the change in this aspect of the evaluation." (Id. at 49-50 (citing id. at 536)). Finally, the ALJ noted Dr. Mehar's opinion that "the claimant's ability to lift/carry [was] '0' pounds," which the ALJ characterized as "on its face absurd." (Id. at 50 (quoting id. at 536)).

---

"[s]itting . . . for more than 10 to 15 minutes aggravates his symptoms." (See Tr. 49, 668).

[121] The Appeals Council had instructed the ALJ to re-contact Dr. Mehar for clarification and further development of the record. (Tr. 138). However, ae mentioned, the ALJ "unsuccessfully attempted to get further information concerning Dr. Mehar's evaluations. The office was advised that Dr. Mehar had retired." (Id. at 40 n.1; see also id. at 1057-59).

After summarizing this evidence,[122] the ALJ gave "greater evidentiary weight" to the evaluations of Dr. Polepalle and Dr. Hosain and "the greatest amount of evidentiary weight" to Dr. Polepalle. (Id. at 50). The ALJ found Dr. Mehar's records "inconsistent" and "not explain[ed]," in contrast with those from Drs. Polepalle and Hosain, which the ALJ found "more consistent with the objective medical evidence." (Id.). The ALJ further noted that Dr. Mehar was plaintiff's primary-care doctor and, by plaintiff's own admission, uninvolved in pain management for his back injury. (Id.). Finally, the ALJ found Dr. Polepalle particularly suited to evaluate plaintiff's RFC because of her background as a board certified pain management specialist. (Id.).

In concluding this segment of his analysis, the ALJ stated as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not consistent with the objective medical evidence for the period at issue.

---

[122] The ALJ also added that, while he considered the April 29, 2009 RFC assessment, he did not afford it "significant evidentiary weight" because (1) it was based solely on a review of the evidence, and not an actual examination and (2) it was compiled subsequent to the date last insured. (Tr. 51 (citing id. at 634-49)).

(<u>Id.</u>). Without evaluating the credibility of statements made by plaintiff that, according to the ALJ, run contrary to the objective evidence, the ALJ simply then noted that "[t]here is evidence that the claimant's medical condition may have worsened in the years subsequent to calendar year 2008 . . . but the ALJ is required to assess the claimant's medical condition as of . . . the date last insured." (<u>Id.</u>).

Finally, at step five of the required analysis, ALJ Katz applied Medical-Vocational Rules 201.27 and 201.28 to support a finding that plaintiff was "not disabled." (<u>Id.</u> at 52).[123] In the application of these rules, the ALJ considered plaintiff's age,

---

[123] Under Rule 201.27, a "younger individual" (age 18-44), who is a high school graduate or more, and has either no past work experience or past experience in unskilled work is determined to be not disabled. 20 C.F.R. Pt. 404, Subpt. P, Appx. 2 § 201.27. As noted, the ALJ states that he also applied Medical-Vocational Rule 201.28. (Tr. 52). This second rule governs younger individuals, who are high school graduates or more, with non-transferable work experience that is either skilled or semi-skilled. 20 C.F.R. Pt. 404, Subpt. P, Appx. 2 § 201.28.

The ALJ elsewhere wrote that "the claimant's past relevant work is considered 'unskilled.'" (Tr. 51). The ALJ went on to state that "[t]he claimant was the owner/operator of a small business from which he must have necessarily derived experience running a business, dealing with financial matters and working with customers." (<u>Id.</u>). He nevertheless repeated that he "has considered the claimant's past work experience as 'unskilled' for the purpose of this determination." (<u>Id.</u>).

The ALJ's utilization of both Rules 201.27 and 201.28 was likely an acknowledgement of the requirement that "in applying the grid rules the Commissioner must treat a skilled or semi-skilled work history with no transferable skills as equivalent to an unskilled work history." <u>Barillaro v. Comm'r of Soc. Sec.</u>, 216 F. Supp. 2d 121, 130-31 (E.D.N.Y. 2002) (quoting <u>Silveira v. Apfel</u>, 2014 F.3d 1257, 1260 (9th Cir. 2000)). This is echoed in the SSA regulations: "If you cannot use your skills in other skilled or semi-skilled work, we will consider your work background the same as unskilled." 20 C.F.R. § 404.1565.

education, work experience, and RFC. (<u>Id.</u>). He determined that plaintiff (1) was a "younger individual" under 20 C.F.R. § 404.1563, having been 37-years-old on his date last insured, (2) was able to communicate in English with at least a high-school education, and (3) was in the past either an unskilled worker or a skilled worker with non-transferable skills, which is an immaterial distinction under the applicable rules, both of which result in a finding of "not disabled." (<u>Id.</u> at 51). Finally, the ALJ explained that his determination of not disabled was "further buttressed" by the testimony of the vocational expert at the second hearing. (<u>Id.</u> at 52). The ALJ listed the three jobs proposed by Mr. Flomberg, and stated that "[t]he ALJ finds that the claimant could have performed any of those jobs during the period at issue and that those jobs exist in significant numbers in the national and local economies." (<u>Id.</u>). Accordingly, the ALJ found plaintiff "not disabled." (<u>Id.</u>).

## V.   <u>This Case</u>

On April 26, 2013, subsequent to the Appeals Council's denial of plaintiff's request for review (<u>id.</u> at 1), plaintiff filed the present action, seeking judicial review of the SSA's decision. He argues that the Commissioner's findings are not supported by

substantial evidence and contrary to the law. (Compl. ¶ 7). The parties have cross-moved for judgment on the pleadings.

## ANALYSIS

### I.   Standard of Review

When a claimant challenges the Social Security Administration's denial of disability benefits, a court may set aside the Commissioner's decision only if it is not supported by substantial evidence or was based on legal error. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam))); see 42 U.S.C. § 405(g) (stating that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").

"Substantial evidence" is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir.

81

2004). The substantial-evidence test applies not only to the Commissioner's factual findings, but also to inferences drawn from the facts. E.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999). In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because analyzing the substantiality of the evidence supporting the Commissioner's decision must also include that which detracts from its weight. See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)); Williams ex rel. Williams, 859 F.2d at 258.

The Commissioner, not the court, must resolve evidentiary conflicts and appraise the credibility of witnesses, including the claimant. See, e.g., Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Carroll, 705 F.2d at 642. However, "[i]n the absence of a medical opinion to support the ALJ's finding as to [a plaintiff]'s ability . . . , it is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. . . .'" Balsamo, 142 F.3d at 81 (quoting McBrayer v. Sec'y of Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983)).

While the ALJ need not resolve every conflict in the record, Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981), "the crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984); cf. Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) (holding that claimant was entitled to an explanation of why the Commissioner discredited her treating physician's disability opinion).

In addition to the consideration of the evidence in the record, a reviewing court must consider the ALJ's application of the law to the record before him. Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 422 (S.D.N.Y. 2010). The court "reviews de novo whether the correct legal principles were applied and whether the legal conclusions made by the [SSA] were based on those principles." Thomas v. Astrue, 674 F. Supp. 2d 507, 520 (S.D.N.Y. 2009).

Since disability-benefits proceedings are non-adversarial in nature, the ALJ has an affirmative obligation to develop a complete administrative record, even when the claimant is represented by counsel. See Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009); Casino-Ortiz v. Astrue, 2007 WL 2745704, *7

(S.D.N.Y. Sept. 21, 2007) (citing <u>Perez v. Chater</u>, 77 F.3d 41, 47 (2d Cir. 1996)). To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports from her medical sources. 20 C.F.R. §§ 404.1512(d), 416.912(d). Ultimately, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity." <u>Casino-Ortiz</u>, 2007 WL 2745704 at *7 (citing 20 C.F.R. § 404.1513(e)(1)-(3)).

The ALJ must therefore seek additional evidence or clarification when the "report from [claimant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e)(1) (2011-2012), 416.912(e)(1) (2012).[124] The animating principle behind the

---

[124] On March 26, 2012 the Commissioner eliminated the former regulation 20 C.F.R. §§ 404.1512(e), 416.912(e), thereby removing the mandate that the ALJ first contact the treating source to resolve conflicts and ambiguities in the record. How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651 (Feb. 23, 2012) (explaining the new regulations). The new regulation, 20 C.F.R. §§ 404.1520b, 416.920b, "significantly reduce[s]," but does not completely abandon, the need to re-contact a treating source and instead provides an ALJ with several options -- among them contacting the treating source -- to clarify portions of the evidence that are inconsistent or insufficient to allow for a determination of disability. <u>Id.</u>; <u>see</u> <u>also</u> <u>Gabrielsen v. Colvin</u>, 2015 WL 4597548, *6 (S.D.N.Y. July 30, 2015) (discussing the implication of the new regulation for the Commissioner's burden to re-contact the treating source).

In this case, as plaintiff asserts (<u>see</u> Pl.'s Mem. 12 n.2), while the Appeals Council denied review on February 28, 2013 (Tr. 1), the ALJ's decision "is the final decision of the Commissioner of Social Security in your case" (<u>id.</u>), and that decision was rendered on January 17, 2012 (<u>id.</u> at 53), prior to

Commissioner's burden to clarify inconsistencies and ambiguities in the record by seeking additional evidence is "that a hearing on disability benefits is a non-adversarial proceeding." Vazquez v. Comm'r of Soc. Sec., 2015 WL 4562978, *17 n.32 (S.D.N.Y. July 21, 2015) (citing Perez, 77 F.3d at 47).

The ALJ must also adequately explain his reasoning in making the findings on which his ultimate decision rests, and in doing so, he must address all pertinent evidence. See, e.g., Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Ferraris, 728 F.2d at 586-87; see also Allen ex rel. Allen v. Barnhart, 2006 WL 2255113, *10 (S.D.N.Y. Aug. 4, 2006) (finding that the ALJ explained his findings with "sufficient specificity" and cited specific reasons for his decision). An ALJ's "'failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.'" Kuleszo v. Barnhart, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y. 1996)); see also Corporan v. Comm'r of Soc. Sec., 2015 WL 321832, *5 (S.D.N.Y. Jan. 23, 2015).

The Social Security Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings. As expressly

---

the effective date of the new regulation. Accordingly, unless otherwise noted, citations to 20 C.F.R. § 404.1512 refer to the version of that regulation that was effective until March 25, 2012.

stated: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); Butts, 388 F.3d at 382. If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the court will remand the case for further development of the evidence or for more specific findings. Rosa, 168 F.3d at 82-83 (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)). Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. See, e.g., Butts, 388 F.3d at 386 (discussing Curry, 209 F.3d at 124).


II.  Parties' Motions


   a. Plaintiff's Arguments


   Plaintiff asserts that there are four grounds on which to reverse the ALJ's determination that plaintiff was not disabled. First, plaintiff argues that the ALJ failed to follow the treating-

physician rule, a general argument that manifests itself in a number of somewhat overlapping sub-arguments (which we re-order for the sake of analytical clarity): (1) that the ALJ failed to fully develop the record with respect to Drs. Mehar and Rochman, (2) that the ALJ substituted his own opinion for the opinions of Drs. Mehar and Rochman, (3) that the ALJ failed to give controlling weight to the opinions of Drs. Mehar and Rochman, (4) that the ALJ inappropriately and selectively utilized only the portions of Dr. Hosain's records that accorded with the ALJ's preferred result, and (5) that the ALJ erred in not concluding that plaintiff's depression was a "severe" impairment. (Pl.'s Mem. 9-15).

Second, plaintiff argues that the ALJ improperly evaluated plaintiff's credibility by failing to make specific factual findings with respect to credibility. (Id. at 15-19).

Third, plaintiff asserts that the ALJ's RFC assessment is not grounded in substantial evidence. Plaintiff specifically argues that the ALJ's decision fails to provide "function-by-function" assessments, fails to address plaintiff's ability to carry, push, or pull, and fails to ground the RFC determination in citations to the record. Plaintiff also highlights the principle that, in arriving at an RFC determination, both severe and non-severe impairments must be considered. (Id. at 19-23).

Finally, plaintiff argues that the ALJ's "step five" finding of disability was not based upon substantial evidence, in that -- given plaintiff's arguments vis-à-vis the RFC determination -- the hypothetical provided to the vocational expert was flawed and unsubstantiated. (Id. at 8, 23-24).[125],[126]

### b. Defendant's Arguments

Defendant opposes each of plaintiff's arguments.

With respect to plaintiff's arguments on the treating-physician rule, defendant asserts (1) that the ALJ sufficiently developed the record by reaching out to Dr. Mehar's office (Def.'s Mem. 19-20) and that plaintiff's related arguments about Dr. Rochman are "cursor[y]" (Id. at 22), (2) that the discounted opinions of Drs. Mehar and Rochman were otherwise unsupported by the record, and arguments to the contrary are meritless (id. at 20, 22), (3) that the record supports giving controlling weight to Drs. Hosain and Polepalle (id. at 19, 22), (4) that Dr. Hosain's

---

[125] On reply, plaintiff emphasizes that its arguments against the propriety of the ALJ's determinations cannot be countered by appellate counsel's "post-hoc rationalizations for agency action." (Pl.'s Reply Mem. 5-6).

[126] Neither party explicitly argues about the applicability of the rule that permits exclusive reliance on the Grids for a disability determination. See supra pp. 65-66. Nevertheless, we infer such a dispute, given the disagreement surrounding the relevance of plaintiff's depression and related non-exertional limitations, and address its impact below. See infra pp. 137-38.

records were properly evaluated, especially given the retrospective nature of the 2010 and 2011 records (id. at 20-21), and (5) that the claimed severity of plaintiff's depression is not borne out by the relevant records. (Id. at 13-15).

Defendant also argues that both the ALJ's credibility findings and his RFC determinations were substantially supported (id. at 15-25) and generally that the ALJ's ultimate finding of disability was proper. (Id. at 25).

III. Assessment of the Record

We assess the record and conclude that the ALJ's decision suffers from a number of defects that justify a remand for further development of the record and for findings supported by substantial evidence.

a. The ALJ Failed to Acquire Complete Evidence

Under the regulations effective when plaintiff's case became final, if "the evidence [the ALJ] receive[s] from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled," 20 C.F.R. § 404.1512(e), "[w]e will first recontact your treating physician or

psychologist or other medical source to determine whether the additional information we need is readily available." Id. at § 404.1512(e)(1). The ALJ must "seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." Id. (emphasis added). Indeed, an ALJ commits legal error when he rejects a medical assessment without having first sought to develop fully the factual record. Rosa, 168 F.3d at 80.

In this case, despite the over-a-decade-long treating relationship between plaintiff and Dr. Mehar, the ALJ gave little weight to Dr. Mehar's opinions. (Tr. 49-50). Although it is not precisely clear what weight was given to Dr. Mehar's reports, the Appeals Council rightly noted that the ALJ had certainly given "greater" weight to the opinions of Drs. Hosain and Polepalle. (Id. at 130 (citing id. at 49-50)). Given the presumptive importance of Dr. Mehar's opinions, the Appeals Council expressly directed the ALJ to re-contact that physician, stating that "further development [of the record] is necessary." (Id. at 138).

Accordingly, the ALJ sent the aforementioned letter to Dr. Mehar's office, which was returned with the explanation that Dr. Mehar had retired. (Id. at 1058). The obvious question presented is whether this outreach and response sufficed for purposes of the ALJ's responsibility to complete the record with respect to Dr. Mehar -- a question that we answer in the negative.

Defendant argues that the ALJ's letter to Dr. Mehar's office was sufficient compliance with the Appeals Council's mandate for further development of the record. (Def.'s Mem. 19).[127] Yet, the regulations are (or, at least, were, see supra pp. 84-85 n.124) clear about the ALJ's responsibility: He or she must re-contact the treating doctor, unless "we know from past experience that the source either cannot or will not provide the necessary findings." 20 C.F.R. § 404.1512(e)(2). By not further inquiring of Dr. Mehar's office or by not attempting to personally contact Dr. Mehar in some other fashion, it is conceivable that the ALJ was invoking

---

[127] Defendant cites, inter alia, to Rosa, which indeed does state that "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.'" 168 F.3d at 79 n.5 (citing Perez, 77 F.3d at 48). Yet, the references in Rosa and Perez are obviously inapposite to this particular context, which involves an ALJ's discounting of a treating doctor's opinion because of its incompleteness -- which the Appeals Council already determined to be error and thus deemed the record not a "complete medical history." Id. In other words, the SSA itself has acknowledged that the ALJ had an "obligation to seek additional information." Rosa, 168 F.3d at 79 n.5. The relevant inquiry here is not whether there was such an obligation, but whether that obligation was fulfilled.

this exception (although he certainly did not make that invocation explicit). The regulations add that "[i]f the information we need is not readily available from the records of your medical treatment source, or we are unable to seek clarification from your medical source," provided the ALJ has "made every reasonable effort to obtain evidence from your own medical sources," he is to "ask [the claimant] to attend one or more consultative examinations at [the SSA's] expense." Id. at § 404.1512(f) (emphasis added).[128]

This "every reasonable effort" requirement is further defined in the regulations and "means that we will make an initial request for evidence from your medical source and, at any time between 10

---

[128] The text of this consultative-examination requirement uses plainly mandatory language. See 20 C.F.R. § 404.1512(f) ("If . . . we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense.") (emphasis added). Accordingly, some courts hold that it is error for an ALJ to fail to order such an examination after it becomes clear that "every reasonable effort" will not result in further development of an incomplete record. See, e.g., Brandow v. Comm'r of Soc. Sec., 2009 WL 2971543, *5 (N.D.N.Y. Sept. 11, 2009) ("While it would be preferable that the ALJ obtain Dr. Uhl's opinions if she finds him cooperative, she must order a consultative examination if Dr. Uhl's opinions are not available.") (citing 20 C.F.R. § 404.1512(f)). However, most courts observe that 20 C.F.R. § 404.1512(f) internally cites to 20 C.F.R. § 404.1517 -- which states that "[i]f your medical sources cannot or will not give us sufficient medical evidence . . . we may ask you to have one or more physical examinations or tests" (emphasis added) -- and frame these examinations as discretionary. See, e.g., Phelps v. Colvin, 20 F. Supp. 3d 392, 401-02 (W.D.N.Y. 2014) (citing cases); Daniels v. Astrue, 2012 WL 1415322, *18 (S.D.N.Y. Apr. 18, 2012); Bailey v. Astrue, 815 F. Supp. 2d 590, 599 (E.D.N.Y. 2011). (As an aside, we observe that while 20 C.F.R. § 404.1512 has undergone seven revisions in the last decade, 20 C.F.R. § 404.1517 has not been changed since its effective date of August 1, 1991.)

Thus, if and when ALJ Katz has exhausted "every reasonable effort" to contact Dr. Mehar, it is within his discretion to order a consultative examination or not; and we will not opine on how that discretion should be utilized.

and 20 calendar days after the initial request, if the evidence has not been received, we will make one followup request to obtain the medical evidence necessary to make a determination." Id. at § 404.1512(d)(1); see also Rosasio v. Astrue, 2013 WL 3324299, *7 n.4 (S.D.N.Y. June 25, 2013) (reasonable efforts made after (1) plaintiff's counsel attempted to obtain records herself, (2) the ALJ issued a subpoena, and (3) the ALJ made two follow-up calls); Caputo v. Astrue, 2010 WL 3924676, *3 (E.D.N.Y. Sept. 29, 2010).

We recognize that the language used in the regulation to define "every reasonable effort" is something of an awkward fit to the current context. Nevertheless, we still conclude that the ALJ failed to meet his responsibilities.

We observe that the letter sent to Dr. Mehar's office quite clearly requested information and additional medical records from Dr. Mehar himself. (Tr. 1058). No indication was given that -- in event that Dr. Mehar could not personally respond to the inquiry, records or other relevant information were still desired to the extent feasible. (Id.). The ALJ also did not follow up with Dr. Mehar's former office by at least attempting to obtain updated contact information for Dr. Mehar.

Complying with the "every reasonable effort" requirement is not always straightforward. See, e.g., Tessier v. Astrue, 2010 WL 419969, *2 (W.D.N.Y.). In Tessier, the plaintiff's treating physician had sold her practice since the relevant treatment years -- nine years before the ALJ issued his denial of benefits. Id. & n.2. "Five employees of [the physician that purchased the treating doctor's practice] searched the warehouse containing medical records for ten hours," yet the relevant records could not be located. Id. The ALJ therefore decided to rely upon plaintiff's counsel's summary of conversations he held with the long-retired treating physician, even though that doctor had offered to testify via telephone at the hearing. Id. at *2. This was reversible error, held to fall beneath the "every reasonable effort" standard, and the case was remanded for further proceedings. Id. at *2, *4.

We cannot say with exactitude what would constitute sufficient inquiry to satisfy the "every reasonable effort" standard in this case; but one vague letter sent to Dr. Mehar's office undoubtedly falls below that line, especially given the mandate in Section 404.1512(d)(1) that the ALJ at least twice attempt to obtain the necessary information before giving up.[129]

---

[129] On this subject, we also note that the letter originally sent to Dr. Mehar's office was itself plainly deficient. Given the importance of the length of a treatment relationship to the weight of a treating physician's opinions, see infra pp. 101-02, the confusion in the record over when Dr. Mehar began treating plaintiff, see supra p. 43 n.74, and the ALJ's repeated reference to

Furthermore, despite years of regular visits with, and treatment by, Dr. Rochman (Tr. 829, 839, 989-91), the ALJ gave "no evidentiary weight to Dr. Rochman's 2011 opinion." (Id. at 46). ALJ Katz asserted that Dr. Rochman's opinion was entirely worthless, inter alia, because, like Dr. Mehar's RFC assessments, it was given in "check off" format. (Id.). Failing to further develop this record, by itself, is sufficiently egregious to justify remand and, on remand, the Commissioner should seek to fill in the blanks in Dr. Rochman's opinion, as in Dr. Mehar's.

In that vein, we observe that the Appeals Council explicitly did not limit its instructions to the ALJ to seek out further information only from Dr. Mehar. (Id. at 138-39). Instead, the Council instructed the ALJ to "[r]e-contact the claimant's physicians for clarification of medical source opinions, as necessary." (Id. at 138). The Appeals Council having remanded the case to the ALJ for failing to re-contact Dr. Mehar in the wake of a discounted "check-off" report, the ALJ had the same responsibility vis-à-vis Dr. Rochman.

---

the pre-accident history of Dr. Mehar's treatment and diagnosis of plaintiff's depression (see Tr. 44, 46), any complete request for records must reach back to before 2008.

b. The ALJ Impermissibly Substituted his Own Opinion for
   Medical Opinion

As mentioned, while the Commissioner bears the responsibility
for resolving evidentiary conflicts, "[i]n the absence of a medical
opinion to support the ALJ's finding as to [a plaintiff]'s ability
. . . , it is well-settled that 'the ALJ cannot arbitrarily
substitute his own judgment for competent medical opinion.'"
Balsamo, 142 F.3d at 81 (quoting McBrayer v. Sec'y of Health and
Human Servs., 712 F.2d 795, 799 (2d Cir. 1983)).

Plaintiff identifies two errors that the ALJ made in this
regard. First, plaintiff addresses the ALJ's assertion that an
inability to even lift "0" pounds is "on its face absurd," and
argues that this conclusion is reversible error. (Pl.'s Mem. 11
(quoting Tr. 49-50)). We agree. Defendant counters that the ALJ's
determination is supported by evidence from Drs. Levin and Degen
(Def.'s Mem. 20), to which plaintiff rightfully retorts that "[a]
reviewing court 'may not accept appellate counsel's post hoc
rationalizations for agency action.'" (Pl.'s Reply Mem. 6 (quoting
Snell, 177 F.3d at 134)). Indeed, the ALJ did not mention the Levin
or Degen records in discounting Dr. Mehar's finding of plaintiff's
inability to lift (Tr. 49-50), and thus defendant's counsel's

attempt to now justify the ALJ's conclusions with its own citations to the record is inappropriate.

Second, plaintiff argues that the ALJ also improperly substituted his own opinion for Dr. Rochman's. (Pl.'s Mem. 15). While plaintiff does not say precisely which of the ALJ's findings suggests a medical opinion without foundation in the record, we observe that the plaintiff also vaguely takes issue with the following statement of the ALJ: "In fact, the claimant was not seen by Dr. Rochman until **after** the date last insured – so there is no logical way the physician could retrospectively attribute the consequences of depression to an earlier point in time." (Id. (quoting Tr. 46)).

In other words, without any factual citation to medical opinion stating as much, the ALJ opines that a retrospective report issued by a post-date-last-insured treating doctor can in "no logical way" pinpoint the onset of depression to "an earlier point in time." (Id. at 46). This is a clear violation of the principle that an ALJ may not "substitute his own judgment for competent medical opinion," Balsamo, 142 F.3d at 81 (internal quotation omitted), and, we also note, blatantly contrary to relevant case law. See, e.g., Camilo v. Comm'r of Soc. Sec. Admin, 2013 WL 5692435, *22 (S.D.N.Y. Oct. 2, 2013) ("Although retrospective

diagnoses do not command the same deference as contemporaneous diagnoses, a treating physician's retrospective opinion is entitled to 'significant weight.'") (quoting Dousewicz v. Harris, 646 F.2d 771, 774 (2d Cir. 1981)); Lacava v. Astrue, 2012 WL 6621731, *13 (S.D.N.Y. Nov. 12, 2012) (quoting Monette v. Astrue, 269 F. App'x 109, 113 (2d Cir. 2008)) ("'[T]he fact that a treating physician did not have that status at the time referenced in a retrospective opinion does not mean that the opinion should not be given some, or even significant weight.'"); Martinez v. Massanari, 242 F. Supp. 2d 372, 378 (S.D.N.Y. 2008) ("The ALJ's failure to pursue and consider the possibility of retrospective diagnosis based on [] subsequent tests and treatments was error.").

   We acknowledge that the November 2011 report issued by Dr. Rochman is thinly supported by explanation. (See Tr. 1053-56). However, given the presumptive validity of retrospective opinions of treating physicians, this only further underscores the ALJ's responsibility to have further developed the record in this respect.[130]

---

[130] We observe that the November 2011 report by Dr. Rochman does not itself make plain that it refers to the period immediately subsequent to the March 3, 2008 accident. (See Tr. 1053-56). The most specific temporal information provided is a check-mark affirming that the "patient's impairment lasted or can [] be expected to last at least twelve months." (Id. at 1056). Nevertheless, the ALJ reads this report -- not unreasonably -- as indeed opining on the post-accident period (see id. at 46), an interpretation that we do not question here. Still, this facial lack of clarity emphasizes the need to further develop the record. Accord Lacava, 2012 WL 6621731 at *13 ("Where there is ambiguity

c. <u>The ALJ Failed to Correctly Apply the Treating Physician
Rule</u>

Apart from the ALJ's failure to develop the record and his
impermissibly substituting his own opinion for medical opinion,
his analysis also fails to comply with the treating-physician rule.
Social Security regulations and Second Circuit precedent generally
require the ALJ to place presumptive weight on the opinions of
treating physicians:

> Generally, we give more weight to opinions from your
> treating sources, since these sources are likely to be
> the medical professionals most able to provide a
> detailed, longitudinal picture of your medical
> impairment(s) and may bring a unique perspective to
> the medical evidence that cannot be obtained from the
> objective medical findings alone or from reports of
> individual examinations, such as consultative
> examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "[T]he opinion of a
claimant's treating physician as to the nature and severity of the
impairment is given 'controlling weight' so long as it 'is well-
supported by medically acceptable clinical and laboratory
diagnostic techniques and is not inconsistent with the other
substantial evidence in [the] case record.'" <u>Burgess</u>, 537 F.3d at
128 (internal citations omitted). Among such medically acceptable
techniques, "[a] patient's report of complaints, or history, is an

---

regarding whether a treating physician's statement bears on the alleged period
of disability, the ALJ must seek to resolve this ambiguity.") (citing cases).

essential diagnostic tool." Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003) (quoting Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997)).

A treating physician is defined as a claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." Tarsia v. Astrue, 416 F. App'x 16, 18 (2d Cir. 2011) (quoting 20 C.F.R. § 404.1502); see also Brickhouse v. Astrue, 331 F. App'x 875, 877 (2d Cir. 2009).

Typically, the treating physician's opinion is not afforded controlling weight if it is inconsistent with the other medical experts' opinions or not otherwise supported by record evidence. Burgess, 537 F.3d at 128; Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Snell, 177 F.3d at 133. "[A]nd the report of a consultative physician may constitute such evidence." Marquez v. Colvin, 2013 WL 5568718, *12 (S.D.N.Y. Oct. 9, 2013) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir.1983)). "However, not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." Burgess, 537 F.3d at 128. For example, the Second Circuit has held that "an expert's opinion [is] not substantial .

. . where the expert . . . giv[es] an opinion couched in terms so vague as to render it useless in evaluating the claimant's residual functional capacity." Id. at 129 (internal quotations omitted).


If an ALJ does not afford the treating physician's opinion controlling weight, he must provide "good reasons" for declining to do so, as well as "good reasons" for according those opinions whatever weight he assigns to them. Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Key factors that the ALJ "must consider" include:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran, 362 F.3d at 32; accord Clark, 143 F.3d at 118. Moreover, the ALJ may not simply rest on the inadequacy of a treating physician's report to deny that report controlling weight. The Second Circuit has held that "the lack of specific clinical findings in the treating physician's report did not, standing by itself, justify the ALJ's failure to credit the physician's

opinion." <u>Clark</u>, 143 F.3d at 118. Instead, "it was the ALJ's duty to seek additional information from [the treating physician] <u>sua sponte</u>." <u>Schaal v. Apfel</u>, 134 F.3d 496, 505 (2d Cir. 1998) (citing <u>Perez</u>, 77 F.3d at 47).

Finally, the Commissioner reserves the authority to issue the opinion on whether a claimant is "disabled." Therefore, neither a treating physician's opinion nor that of a consultative physician is controlling on such determinations. 20 C.F.R. §§ 404.1527(d), 416.927(d).

### i. Dr. Mehar's Treatment Notes and Opinions

ALJ Katz gave apparently little weight to Dr. Mehar's opinions regarding plaintiff's injuries and asserted physical impairments. (<u>See</u> Tr. 49-50). The ALJ's principal rationales for this decision include (1) an inconsistency between the 2008 and 2009 RFC assessments regarding plaintiff's ability to sit, (2) the fact that many of these assessments were provided in "check-off" format, (3) the ALJ's perceived "absurd[ity]" regarding the notion that Dr. Mehar could believe plaintiff entirely unable to carry, and (4) the fact that, unlike Dr. Polepalle, Dr. Mehar was not board certified in pain management and, unlike Dr. Hosain, Dr. Mehar was apparently "**not involved** in [plaintiff's] pain management." (<u>Id.</u>).

102

Clearly, the record supports the ALJ's sense that Dr. Mehar's reports may, in certain respects, be internally inconsistent as well as in contradiction with the reports and opinions of other doctors and, perhaps, the objective medical evidence as well. However, this reality once again emphasizes the ALJ's need to have further developed the record with respect to Dr. Mehar's impressions.

Importantly, the ALJ also failed to refer to the first factor mentioned above, that is "the frequency of examination and the length, nature and extent of the treatment relationship." Halloran, 362 F.3d at 32. This may in some measure be due to the confusion regarding when, in fact, Dr. Mehar began to treat plaintiff. See supra p. 43 n.74. But this treatment relationship, at the very least, had lasted for approximately twelve years before plaintiff's accident, id., and, to the degree relevant, if the ALJ was unsure about the extent of the relationship, he should have inquired further.

Finally, as plaintiff pointed out on reply (see Pl.'s Reply Mem. 1-2), we note that -- in contrast with the multiyear treatment relationship between plaintiff and Dr. Mehar -- Dr. Polepalle performed a single IME of Mr. Salisbury in October 2008. (Tr. 668-72). The Second Circuit has "previously cautioned that ALJs should

103

not rely heavily on the findings of consultative physicians after a single examination," Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013) (citing Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990)), which is precisely what the ALJ has done. On remand, the ALJ should account for the Second Circuit's directive on this point -- along with the other deficiencies in the ALJ's consideration of Dr. Mehar's opinions -- and alter the weight given to Dr. Polepalle accordingly.

## ii. East Orange Treatment Notes and Opinions

As mentioned, ALJ Katz gave absolutely "no evidentiary weight" to Dr. Rochman's November 15, 2011 report because, inter alia, (1) it was given in check-off format, (2) Dr. Rochman's treating notes from early 2010, according to the ALJ, **do not** corroborate the intensity of mental debilitation reported," (3) plaintiff was not seen by Dr. Rochman until after the date last insured, and (4) seemingly because Dr. Rochman did not "identify himself as a psychiatrist." (Tr. 45-46 & n.6).

We have already noted that Dr. Rochman is indeed a psychiatrist, a fact that the ALJ could have easily uncovered. To the extent that the ALJ was suggesting that Dr. Rochman's purported lack of credentials was significant in assessing the factor of

"whether the opinion is from a specialist," <u>Halloran</u>, 362 F.3d at 32, he was simply wrong and must, on that ground alone, reconsider his assessment of Dr. Rochman.

We have also already discussed the ALJ's improper opinion that retrospective medical assessments are unworthy of weight and the ALJ's need to have re-contacted Dr. Rochman to fill in whatever gaps the record presents. <u>Accord</u> <u>Rolon v. Comm'r of Soc. Sec.</u>, 994 F. Supp. 2d 496, 508 (S.D.N.Y. 2014).

Here, we add that the ALJ stated that Dr. Rochman "<u>only</u> saw the claimant every 2-3 months" (<u>id.</u> at 46 n.6) (emphasis added), a statement that is plainly wrong. Mr. Salisbury testified that he saw Dr. Rochman approximately every month (<u>id.</u> at 114), a frequency of treatment that is corroborated in the record. <u>See</u> <u>supra</u> pp. 51-53. Given the importance of treatment frequency to an ALJ's assessment, <u>see</u>, <u>e.g.</u>, 20 C.F.R. § 404.1527(c)(2)(i), this further underscores the need to reevaluate Dr. Rochman's opinions and assign them appropriate weight.

Moreover, with respect to the ALJ's assertion that Dr. Rochman's "treating notes **do not** corroborate the intensity of mental debilitation reported **until July 2010**" (Tr. 46 n. 6), we observe that -- even putting aside the social worker notes -- Dr.

Rochman himself wrote on May 20, 2009 that plaintiff "[c]ontinues to be depressed" (id. at 835), on October 21, 2009 that plaintiff was "feeling lack of interest in things" (id. at 832), and on March 10, 2010 that plaintiff was suicidally ideating. (Id. at 830). The ALJ made no effort to reconcile these notes with his determination that Dr. Rochman's November 2011 report is essentially incompatible with his real-time observations until July 2010. Given the "heightened duty of explanation when a treating physician's medical opinion is discredited," Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 199 n.1 (2d Cir. 2010), the reasons provided by the ALJ for entirely discrediting Dr. Rochman's opinions fall well short of the "good reasons" required. Accord Halloran, 362 F.3d at 33 (explaining that courts "do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion").

We also note that -- referring to the March 2010 social worker records in which MEB found plaintiff "fully disabled" (Tr. 828) -- the ALJ wrote that he "cannot accept this conclusory finding by a 'non-acceptable' medical source." (Id. at 45). Although reports of a social worker indeed are not an "acceptable medical source,"

see 20 C.F.R. § 416.913(a), such records must still be considered,

see id. at § 416.913(d), especially when that source is engaged in

a primary or regular treatment relationship with the claimant.

See, e.g., Mitchell v. Colvin, 2013 WL 5676289, *8 (E.D.N.Y. Oct.

17, 2013) (citing cases); Camilo, 2013 WL 5692435 at *20 (citing

cases); White v. Comm'r of Soc. Sec., 302 F. Supp. 2d 170, 176

(W.D.N.Y. 2004) (citing cases). Indeed, a non-medical source "who

has seen the claimant in his or her professional capacity may,

under certain circumstances, properly be determined to outweigh

the opinion from a medical source, including a treating source."

Mitchell, 2013 WL 5676289 at *8. Thus, on remand, the ALJ must

articulate the degree to which he discounted the social workers'

records and notes because of their status as non-acceptable medical

sources and accord them the weight deserved under the appropriate

regulations.


d. Selective Assessment of the Evidence


Plaintiff also argues that the ALJ erred by improperly

"pick[ing] and choos[ing] those portions of the medical records

which support his contentions and overlooks those portions that

are favorable to Mr. Salisbury." (Pl.'s Mem. 14). Quite plainly,

"[t]he ALJ cannot pick and choose evidence in the record that

supports his conclusions." Cruz v. Barnhart, 343 F. Supp. 2d 218,

224 (S.D.N.Y. 2004) (internal quotation omitted); see also Vazquez
v. Comm'r of Soc. Sec., 2015 WL 4562978, *17 (S.D.N.Y. July 21,
2015); Callanan v. Astrue, 2011 WL 589906, *4 (E.D.N.Y. Feb. 10,
2011) (citing Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir.
1983)); Brown v. Apfel, 1999 WL 144515, *4 (S.D.N.Y. Mar. 16, 1999)
(quoting Valente v. Secretary of HHS, 733 F.2d 1037, 1045 (2d Cir.
1984)). Yet, he has indeed done so here, although not necessarily
for the reasons plaintiff articulates.

Plaintiff specifically asserts that the ALJ erred in this
respect by giving "greater evidentiary weight" to Dr. Hosain's
opinions and nevertheless arriving at a fairly broad RFC
assessment. (See Tr. 47, 49-50). Plaintiff asserts "that Dr. Hosain
states that Mr. Salisbury can lift no more than ten pounds and
must change positions frequently when sitting or standing" (Pl.'s
Mem. 13 (citing Tr. 718)), and yet the ALJ ultimately determined
that plaintiff had the ability to sit for eight hours and lift or
carry items weighing ten pounds. (Pl.'s Mem. 13 (citing Tr. 47)).

We first point out that plaintiff's weight-related argument
is an obvious non-starter. That Dr. Hosain opined that plaintiff
could lift no more than ten pounds is not inconsistent with the
ALJ's RFC finding of the same. While the argument about sitting is
somewhat more compelling, nothing in the March 2010 report from

Dr. Hosain -- which illustrated plaintiff's inability to "sit in one position" for "more than about 10 minutes" (Tr. 718) -- precludes the ALJ from finding that plaintiff can sit for extended periods. (See id. at 47). Dr. Hosain only wrote that plaintiff could not sit "in one position." (Id. at 718).

That said, there is a glaring example of selective utilization of Dr. Hosain's records, for which remand is appropriate. The ALJ's brief discussion of Dr. Hosain's records focuses on treatment from 2008. (Id. at 49). The ALJ calls particular attention to Dr. Hosain's June 24 and August 27, 2008 notes. (Id.). Moreover, when discussing plaintiff's asserted mental impairment, the ALJ addresses Dr. Hosain's observations on June 24, July 30, and August 27, 2008 "that the claimant['s] mood and affect were normal and that he was oriented times three." (Id. at 44). A few pages later, the ALJ dismisses plaintiff's depression in part because "[a]ll of the foregoing opinions concerning the claimant's mental health were, of course, made at points in time **subsequent** to the claimant's date last insured." (Id. at 46).

The ALJ, however, is ignoring one of Dr. Hosain's notes from July 30, 2008, in which he wrote that "[g]iven the etiology of his pain and his past history of depression the patient is likely to have persisting chronic back pain for some period of time" and

that "[r]ecovery from his condition is likely to be slow and drawn out." (Id. at 754). In so doing, the ALJ cherry-picks the portions of Dr. Hosain's notes -- indeed, of this very page -- that support the ALJ's conclusion that plaintiff was not suffering from even a non-severe mental impairment that may have exacerbated plaintiff's pain or otherwise affected his ability to work. On remand, especially given the great weight accorded to Dr. Hosain's contemporaneous records, the ALJ must account for all of Dr. Hosain's opinions.[131]

Finally, on the subject of "picking and choosing," we note that -- while perhaps not facially obvious -- the ALJ's decision is rife with subtly insidious incongruities that arbitrarily favor one result over another in a fashion that reeks of outcome determinativeness. By way of example, we address the ALJ's characterizations of the work-related assessments of Drs. Levin, Hosain, and Polepalle. On the one hand, the ALJ discounts Dr.

---

[131] We note that, in her opposition, defendant takes issue with plaintiff citing to 2010 and 2011 records for purposes of attacking the ALJ's characterizations of Dr. Hosain's 2008 opinions. (Def.'s Mem. 20-21). Defendant argues -- generally echoing the ALJ -- that these records are too late in time to be given "conclusive" or "controlling" weight. (Id. (citing Byam v. Barnhart, 336 F.3d 172, 183 (2d Cir. 2003)). Putting aside the fact that the ALJ himself appears to have given the March 2010 report from Dr. Hosain significant, if not controlling, weight (see Tr. 49 n.9 & 51 ("In arriving at this conclusion, the ALJ has considered Dr. Hosain's opinion of March 6, 2010, which was to the effect that the claimant was unable to work **at his regular occupation** (as a landscaping person) from March 3, 2008 up to the present.")), the notion that notes written during the period at issue should be given particular consideration further emphasizes the selective nature of the ALJ's assessment of Dr. Hosain's records.

Levin's statement that plaintiff was "out of work until further notice" (see id. at 138) as a statement that "cannot be accepted by the ALJ as determinative [because] Dr. Levin, of course, is not a vocational expert who is competent to give opinions as to whether the claimant can work." (Id. at 48). Yet, the ALJ does not similarly qualify Dr. Hosain's March 2010 note that plaintiff was (according to the ALJ, only) "unable to work at his regular occupation" (id. at 719) or Dr. Polepalle's October 2008 impression that she "believe[s] that the patient is able to return to previous activities including his work." (Id. at 670). Indeed, the ALJ appears to use Dr. Hosain's March 2010 record as a central justification for the ultimate RFC finding. (See id. at 51 ("In arriving at this conclusion, the ALJ has considered Dr. Hosain's opinion of March 6, 2010 . . .")). This inconsistency, without good reasons proffered for distinguishing these records on that particular ground, is inappropriate and, as above, justifies remand for either a reconsideration of these records or, at the very least, an explanation for why they would be assessed in such different fashion.

e. Depression and Severity Finding

Plaintiff also argues that the ALJ erred at step two of the required analysis when he determined that plaintiff was not suffering from a severe mental impairment. (Pl.'s Mem. 15). The Commissioner contends that substantial evidence supports this finding. (Def.'s Mem. 13-15).

As mentioned, a mental impairment will not be deemed severe unless certain criteria have been met. See, e.g., 20 C.F.R. § 404.1520a(c)-(d). When any mental impairment is found, the ALJ will rate the degree of functional limitations resulting from such impairment in order to determine its severity. 20 C.F.R. §§ 404.1520a(d), 416.920a(d). The four functional areas assessed are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). The first three functional areas are rated on a five-point scale of "none, mild, moderate, marked, and extreme," and the fourth functional area is rated on a four-point scale of "none, one or two, three, [and] four or more." Id. Under the regulations, should an ALJ find that an individual's limitation in the first three functional areas are "none" or "mild" and in the fourth area are "none," then it will "generally [be] conclude[d] that [the]

112

impairment(s) is not severe" unless there is evidence that
indicates a greater-than-minimal limitation in the individual's
ability to do "basic work activities." 20 C.F.R. §§
404.1520a(d)(1), 416.920a(d)(1). The term "basic work activities"
is defined as the "abilities and aptitudes necessary to do most
jobs," which include, among others, "understanding, carrying out,
and remembering simple instructions" and "responding appropriately
to supervision, co-workers and usual work situations." 20 C.F.R.
§§ 404.1521(b), 416.921(b).

Furthermore, the ALJ must "document application of the
technique[132] in the decision." 20 C.F.R. §§ 404.1520a(d),
416.920a(d). This documentation entails "incorporat[ing] the
pertinent findings and conclusions based on the technique," as
well as the "significant history, including examination and
laboratory findings, and the functional limitations that were
considered in reaching a conclusion about the severity of the
mental impairment(s)" in the written decision. 20 C.F.R. §§
404.1520a(d)(4), 416.920a(d)(4).

---

[132] "[T]echnique" refers to the application of the "paragraph B" criteria
in determining the severity of the applicant's mental impairment. See 20 C.F.R.
§ 404.1520a.

113

Here, ALJ Katz found no deficits in either plaintiff's social functioning or activities of daily living, "[a]t best" mild deficits in concentration ability "which would have had only a very minimal adverse impact on the claimant's ability to perform basic work activities," and no evidence of decompensation during the period at issue. (Tr. 46). In arguing that this determination was justified, defendant points to various pieces of evidence assertedly considered by the ALJ, including (1) Dr. Hosain's 2008 treatment notes (Def.'s Mem. 14), (2) plaintiff's asserted failure to seek treatment for his depression until 2009 (id.), (3) the fact that plaintiff "had varied activities of daily living, which includ[ed] caring for his children, preparing meals, driving, shopping in stores, using the computer, and watching television" (id. at 15 (citing Tr. 45 n.4, 606-10)), and (4) the fact that that plaintiff "had no problems getting along with . . . people." (Def.'s Mem. (citing Tr. 610-11)).

We have already pointed out a number of problems with the ALJ's finding that plaintiff's depression was non-severe, including the ALJ's apparent discounting of Dr. Rochman for his incorrectly assumed lack of qualifications, see supra p. 70 n.107, the ALJ's selective utilization of Dr. Hosain's notes in 2008, see supra pp. 107-11, and the ALJ's failure to further develop the

record with respect to Dr. Rochman and Dr. Mehar. <u>See</u> <u>supra</u> pp. 89-95.[133]

Moving on to the ALJ's assertion that "[t]he claimant did not seek out formal psychiatric care until the spring of 2009- **well subsequent** to his date last insured" (Tr. 44), we note the following. First, by "well subsequent," the ALJ is presumably referring to the approximately two months between plaintiff's date last insured and the early-March-2009 appointment with Mr. Sullivan, the first East Orange social worker to see plaintiff. (<u>See</u> <u>id.</u> at 837-38). We have already noted that the paperwork for this visit appears to have been started in late February of 2009. <u>See</u> <u>supra</u> p. 46 n. 81. Moreover, as also pointed out, social worker "MEB" wrote that plaintiff "sought help at [East Orange]" in December 2008 (Tr. 830),[134] which would place this outreach at a time <u>before</u> plaintiff's date last insured. Even plaintiff's testimony on the subject -- at <u>both</u> hearings -- only confirmed that he had begun treatment with East Orange in the spring of 2009

---

[133] Although the focus of our assessment of the ALJ's failure to develop the record with respect to Dr. Mehar concerned plaintiff's physical injuries and pain, <u>see</u> <u>supra</u> pp. 89-94, ALJ Katz also makes a number of judgments about plaintiff's mental state based on the incompleteness of Dr. Mehar's January 2009 RFC assessment (<u>see</u> Tr. 44), an error that also warrants remand for inquiry and development.

[134] This assertion also accords with MEB's diagnosis of dysthemic depression that gave way to major depression in December 2008. (Tr. 2008).

(see id. at 68-69, 110-11), not that he failed to reach out until that point.

There is no evidence in the record -- certainly none cited by the ALJ -- that suggests that plaintiff indeed "did not seek out formal psychiatric care until the spring of 2009." (Id. at 44). Indeed, the little evidence that does exist on this small point -- seemingly given great weight by the ALJ and argued by defendant in its opposition brief -- states otherwise. (See id. at 830).[135] As an unsupported factual statement (and perhaps factual error), this cannot serve as a "good reason," Clark, 143 F.3d at 118, for discounting the opinions and diagnoses of plaintiff's treating psychiatrist and therapy team. Accord Tarsia, 416 F. App'x at 18.[136]

We next turn to the subject of the ALJ's assessments of plaintiff's functional limitations. We begin by noting that, notwithstanding ALJ Katz's finding that there is no evidence of decompensation (Tr. 46), in Dr. Rochman's November 2011 report he represents that plaintiff experienced one or two episodes of

---

[135] We also point out that there is an inherent, common-sense logic to the general notion that, emergency contexts notwithstanding, a patient is not afforded a doctors' office visit on the very same day he first seeks one out.

[136] Furthermore, social worker "MEB" did note that plaintiff was initially treated for his depression by a "[p]sychiatrist," who prescribed plaintiff's Wellbutrin. (See Tr. 830). We acknowledge that this might be an error on MEB's part, especially given plaintiff's testimony that this early treatment and medication were provided by his primary-care physician. (See id. at 67-68). Nevertheless, this discrepancy at least warrants discussion, if not further inquiry.

decompensation, within a 12-month period, each of at least two weeks. (Id. at 1055). Given the ALJ's responsibility to reevaluate Dr. Rochman findings, see supra p. 95, the ALJ's finding as to decompensation must also be reevaluated accordingly. The same holds true for Dr. Rochman's November 2011 findings about plaintiff's other limitations, including lack of interest, poverty of speech, difficulty concentrating, mood disturbances, and memory impairment, as well as Dr. Rochman's assessment that "even a minimal increase in mental demands" would cause plaintiff to decompensate. (See Tr. 1055).

More broadly, the ALJ's conclusions regarding each of the categories of limitations are unsupported by even a single citation to the record (see id. at 46), which quite obviously must be remedied on remand. Accord Miles, 645 F.2d at 124 ("[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence.").

Moreover, even if one were to string together the ALJ's scattered factual references in the relevant portion of his decision and link them to his ultimate conclusions about plaintiff's limitations, those conclusions still come up markedly short. By way of example, it appears likely that the ALJ found

117

plaintiff not deficient in his ability to perform activities of daily life because of the March 16, 2009 "function report" completed by plaintiff and submitted to the SSA. (See Tr. 45 n.4 (citing id. at 605-15); see also Def.'s Mem. 15). In his decision, the ALJ pointed out that plaintiff "advised that he was able to take care of his children[,] . . . had no problems either operating a motor vehicle or riding in a car[,] . . . [and] was able to go shopping in stores and run errands." (Tr. 45 n.4 (citing id. at 605-15)). The ALJ almost certainly utilized this report (as defendant retrospectively suggests he did (see Def.'s Mem. 15)) to undergird his conclusion that plaintiff had no deficits, and yet the ALJ entirely ignored crucially relevant disclosures in that very same report, including that a babysitter had to put the children down for a nap, dress them, and change them (Tr. 606), that his wife pre-prepared meals (id.), that he cannot play or "interact" with the children as he had previously been able to do (id.),[137] that he could only drive "short distances" (id. at 608), and that he only left the house when absolutely necessary. (Id.).[138]

---

[137] Indeed, at the second hearing, plaintiff explained that, to the extent he cares for the children, it is only "because I have to . . . There's no plan B." (Tr. 65).

[138] This is to say nothing of plaintiff's assertions in the record regarding his mental impairments, including being "unable to focus on conversations or to remember facts," "not handl[ing] [stress or changes in schedule] well," "shut[ing] down," and having trouble remembering "[e]ven basic things, tasks, [and] upcoming events." (Tr. 612).

The ALJ certainly has great latitude to evaluate the records before him -- records bound to contain internal contradictions between and among the various sources. But making this type of egregiously selective use of a report to support conclusions that plaintiff had no limitations, while simultaneously ignoring information in that very same report that runs contrary to those conclusions, is picking and choosing of the worst kind. Accord Callanan, 2011 WL 589906 at *4 ("The ALJ did not simply 'pick and choose' *among* physicians' opinions -- the ALJ selectively chose particular *sentences within* physicians' opinions to arrive at conclusions contrary to those stated in the opinions themselves. This egregiously improper weighing of the evidence merited reversal of the Commissioner's decision.") (discussing Fiorello, 725 F.2d at 176) (emphasis in original).

### f. The ALJ Erred in Assessing Plaintiff's Credibility

The SSA regulations require the ALJ to assess the claimant's credibility in a systematic way and to take seriously the claimant's report of subjective symptoms. 20 C.F.R. § 404.1529. In doing so, the ALJ exercises discretion over the weight assigned to a claimant's testimony regarding the severity of his pain and other subjectively perceived conditions, and his resulting limitations. See, e.g., Schultz v. Astrue, 2008 WL 728925, *12 (N.D.N.Y. Mar.

119

18, 2008) (citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); Snell, 177 F.3d at 135). If the ALJ's findings are supported by substantial evidence, a reviewing court must uphold his decision to discount the claimant's testimony. See Marcus, 615 F.2d at 27 (citing Richardson, 402 U.S. at 401).

Nonetheless, the ALJ's discretion is not unbounded. The Second Circuit has held that throughout the five-step process, "the subjective element of [plaintiff's] pain is an important factor to be considered in determining disability." Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984); Perez v. Barnhart, 234 F. Supp. 2d 336, 340 (S.D.N.Y. 2002); see also 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) ("We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons."). In assessing the claimant's testimony, the ALJ must take all pertinent evidence into consideration. E.g., Perez, 234 F. Supp. 2d at 340-41; see also Snell, 177 F.3d at 135. Even if a claimant's account of subjective pain is unaccompanied by positive clinical findings or other objective medical evidence,[139] it may

---

[139] Objective medical evidence is "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1529(c)(2); see also Casino-Ortiz, 2007 WL 2745704 at *11, n.21 (quoting 20 C.F.R. § 404.1529(c)(2)). Clinical diagnostic techniques include methods showing "residual motion, muscle spasms, sensory deficit or motor

still serve as the basis for establishing disability as long as the impairment has a medically ascertainable source. See, e.g., Harris v. R.R. Ret. Bd., 948 F.2d 123 (2d Cir. 1991) (citing Gallagher v. Schweiker, 697 F.2d 82, 84-85 (2d Cir. 1983)).

SSA regulations require the ALJ to consider "all of the available evidence" concerning a claimant's complaints of pain when they are accompanied by "medical signs and laboratory findings . . . which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . . , would lead to a conclusion that you are disabled." 20 C.F.R. §§ 404.1529(a), 416.929(a).

An ALJ must apply a two-step process to evaluate a claimant's subjective description of his or her impairment and related symptoms. 20 C.F.R. §§ 404.1529, 416.929; see also SSR 96-7p, 1996 WL 374186, at *6-9 (July 2, 1996) (summarizing framework). "First, the ALJ must consider whether the claimant has a medically determinable impairment which could reasonably be expected to

_____

disruption." 20 C.F.R. § 404.1529(c)(2); see also 20 C.F.R. § 404.1528(b). Laboratory findings "are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests." 20 C.F.R. § 404.1528(c).

produce the . . . symptoms alleged by the claimant." <u>Martinez</u>, 2009 WL 2168732, at *16 (alteration in original) (citing <u>McCarthy v. Astrue</u>, 2007 WL 4444976, *8 (S.D.N.Y. Dec. 18, 2007)); <u>see also</u> 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). "Second, the ALJ must 'evaluate the intensity and persistence of those symptoms considering all of the available evidence.'" <u>Peck v. Astrue</u>, 2010 WL 3125950, *4 (E.D.N.Y. Aug. 6, 2010) (citing 20 C.F.R. § 404.1529(c)); <u>accord</u> <u>Meadors v. Astrue</u>, 370 F. App'x 179, 183 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii); <u>Taylor v. Barnhart</u>, 83 F. App'x 347, 350-51 (2d Cir. 2003)). "To the extent that the claimant's 'pain contentions are not substantiated by the objective medical evidence,' the ALJ must evaluate the claimant's credibility." <u>Peck</u>, 2010 WL 3125950, at *4 (citing 20 C.F.R. § 404.1529(c)); <u>see</u> <u>also</u> <u>Meadors</u>, 370 F. App'x at 183-84 (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii); <u>Taylor</u>, 83 F. App'x at 350-51).

It should be noted that "the second stage of [the] analysis may itself involve two parts." <u>Sanchez v. Astrue</u>, 2010 WL 101501, *14 (S.D.N.Y. Jan. 12, 2010). "First, the ALJ must decide whether objective evidence, on its own, substantiates the extent of the alleged symptoms (as opposed to the question in the first step of whether objective evidence establishes a condition that could 'reasonably be expected' to produce such symptoms)." <u>Id.</u> "Second, if it does not, the ALJ must gauge a claimant's credibility

regarding the alleged symptoms by reference to the seven factors listed [in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3)]." Id. (citing Gittens v. Astrue, 2008 WL 2787723, *5 (S.D.N.Y. June 23, 2008)). If the ALJ does not follow these steps, remand is appropriate. Id. at *15 (citing 20 C.F.R. § 404.1529(c)).

When a claimant reports symptoms more severe than medical evidence alone would suggest, SSA regulations require the reviewing ALJ to consider specific factors in determining the credibility of a claimant's symptoms and their limiting effects. SSR 96-7p, 1996 WL 374186, at *2. These seven factors include: (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication that the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); see also Bush, 94 F.3d at 46

n.4; Wright v. Astrue, 2008 WL 620733, *3 (E.D.N.Y. Mar. 5, 2008)
(citing SSR 96-7p).[140]


    Finally, "'[o]nly allegations beyond what is substantiated by
medical evidence are to be subjected to a credibility analysis .
. . [because requiring] plaintiff to fully substantiate [his]
symptoms with medical evidence would be both in abrogation of the
regulations and against their stated purpose." Martin v. Astrue,
2009 WL 2356118, *10 (S.D.N.Y. July 30, 2009) (citing Castillo v.
Apfel, 1999 WL 147748, *7 (S.D.N.Y. Mar. 18, 1999)).


    In this case, plaintiff repeatedly testified about his
chronic and debilitating back pain. (See, e.g., Tr. 106). Plaintiff
also testified that he suffered from depression, exacerbated by
the March 3, 2008 accident and injury. (Id. at 75-76). Each of
these was certainly supported by the prescription of various
related medications (see, e.g., id. at 654, 839), and objective
evidence of plaintiff's pain is found throughout the record,
including after examinations revealing muscle spasms and

---

[140] SSR 96-7p states, in pertinent part, "in recognition of the fact that
an individual's symptoms can sometimes suggest a greater level of severity of
impairment than can be shown by the objective medical evidence alone, 20 C.F.R.
sections 404.1529(c) and 416.929(c) describe the kinds of evidence, including
the factors below, that the adjudicator must consider in addition to the
objective medical evidence when assessing the credibility of an individual's
statements."

restricted ranges of motion. (See, e.g., id. at 531, 655, 646, 746, 751, 761).

In assessing Mr. Salisbury's credibility, ALJ Katz stated as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not consistent with the objective medical evidence for the period at issue.

(Tr. 50). In view of the record, the ALJ's assessments of plaintiff's credibility are deficient in several respects. First, the ALJ employed meaningless boilerplate and improperly conflated his RFC finding with his evaluation of plaintiff's credibility. Second, he ignored substantial evidence in the record supporting plaintiff's testimony regarding his subjective pain and depression, respectively. For the reasons stated below, the Commissioner should be required to further develop the record regarding plaintiff's credibility.

### i. Meaningless Boilerplate

In discrediting plaintiff's testimony, ALJ Katz wrote that "[t]he claimant's medically determinable impairments could

reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the objective medical evidence for the period at issue." (See Tr. 50). This form of analysis is plainly improper.

In Bjornson v. Astrue, the Seventh Circuit criticized similar language as "meaningless boilerplate," noting that it "yields no clue to what weight the trier of fact gave the testimony." 671 F.3d 640, 645 (7th Cir. 2012). Quoting the Tenth Circuit, the Seventh stated as follows:

> Such boilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible. More troubling, it appears that the Commissioner has repeatedly been using this same boilerplate paragraph to reject the testimony of numerous claimants, without linking the conclusory statements contained therein to evidence in the record or even tailoring the paragraph to the facts at hand, almost without regard to whether the boilerplate paragraph has any relevance to the case.

Id. (quoting Hardman v. Barnhart, 362 F.3d 676, 679 (10th Cir. 2004).

We note that some recent cases in the Southern District of New York have found fault with the boilerplate language but nonetheless gleaned enough evidence in support of the ALJ's

credibility analysis.[141] The record in this case, however, is distinguishable. As ALJ Katz failed to complete the record and properly apply the treating-physician rule, even if we overlooked his use of template-driven reasoning, we would be unable to determine whether substantial evidence indeed supports his credibility analysis. A remand is therefore proper.

## ii. Plaintiff's Subjective Pain

Stripped of the ALJ's boilerplate formulation, his rejection of the plaintiff's credibility is devoid of the required explanation that would trigger deference. See Williams ex rel Williams, 859 F.2d at 260-61 (credibility findings and explanations must be "set forth with sufficient specificity").

The SSA regulations require an ALJ to consider "all of the available evidence" concerning a claimant's complaints of pain

---

[141] The following cases found fault with the boilerplate language, but did not direct a remand on that basis because the court found evidence in support of the ALJ's credibility analysis: Gonzalez v. Colvin, 2015 WL 1514972, *20 (S.D.N.Y. Apr. 1, 2015) (remand not necessary as ALJ's credibility finding is supported by substantial evidence); Singleton v. Colvin, 2015 WL 1514612, *16 (S.D.N.Y Mar. 31, 2015) (remand not necessary as evidence in support of ALJ's credibility analysis is overwhelming); Daniels, 2015 WL 1000112, *19 (S.D.N.Y. Mar. 5, 2015) (remand not necessary as ALJ's credibility finding is support by substantial evidence); Reyes v. Colvin, 2015 WL 872075, *15 (S.D.N.Y. Feb. 25, 2015) (remand not necessary as ALJ's credibility finding is support by substantial evidence); Ramos v. Comm'r of Soc. Sec., 2015 WL 708546, *20 (S.D.N.Y. Feb. 4, 2015) (remand not necessary as ALJ's credibility finding is support by substantial evidence).

when they are accompanied by "medical signs and laboratory findings . . . which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . . , would lead to a conclusion that you are disabled." 20 C.F.R. §§ 404.1529(a), 416.929(a). The regulations also insist that an ALJ "will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).

Even if the ALJ could permissibly find that objective medical evidence does not support plaintiff's statements, his decision still lacks evidence and reasoning to support the requisite independent determination that Mr. Salisbury's testimony regarding his subjective pain lacks credibility.[142] The ALJ acknowledged that

---

[142] We acknowledge that the ALJ did seemingly evaluate plaintiff's credibility on one front: Whether he or his wife performed administrative functions of the landscaping business subsequent to the March 2008 accident. (See, e.g., Tr. 43). While, again, the ALJ appears to ground his ultimate determination on this subject on some dubious assumptions, we are not remanding because we find this credibility determination erroneous. Rather, notwithstanding the ALJ's evaluation of plaintiff's credibility on this single topic, the decision is otherwise devoid of credibility assessment, which warrants remand and reconsideration. As plaintiff points out in his memorandum, "[n]ot once does the ALJ discuss the symptoms or the statements of Mr. Salisbury that he finds inconsistent. Not to do so, is error." (Pl.'s Mem. 17). Putting aside the evaluation of the administration of plaintiff's business, we agree with plaintiff's characterization of the ALJ's decision.

the medically determinable impairments that existed "could reasonably be expected to cause" plaintiff's pain. This acknowledgment clearly placed an onus on the ALJ to assess the record regarding plaintiff's pain and its impact on his residual functional capacity.

Here, ALJ Katz failed to make the necessary follow-up.[143] Instead, he rejected the credibility of plaintiff's testimony that he was unable to work due to back pain, but in doing so he failed to weigh appropriately the evidence provided by treating physicians and psychiatrist and instead relied heavily on a single opinion from a consultative source. Once the Commissioner has properly evaluated the evidence on remand, the credibility determination will also need to be revisited in light of her new findings.

---

[143] We note that, in our case, the ALJ did include one bit of additional "analysis" subsequent to the usual SSA boilerplate language, that is, that "[t]here is evidence that the claimant's medical condition may have worsened in the years subsequent to calendar year 2008." (Tr. 50). Indeed, the ALJ calls particular attention to plaintiff's use of a cane at the first hearing, which plaintiff acknowledged was due to increased pain. (See id. at 98-99). However, despite this fact, which plaintiff does not contest, the ALJ still had an obligation to evaluate plaintiff's credibility regarding statements made about the period prior to the date last insured -- not blankety discount any such statements because, by the date of the hearings, plaintiff was in worse shape.

### iii.  Plaintiff's Subjective Mental Condition

ALJ Katz did not analyze Mr. Salisbury's credibility regarding his testimony about his mental impairments. This is because, at step two, he determined those impairments to be non-severe. (Tr. 44-46). When the "paragraph B" criteria are properly applied on remand, a determination of plaintiff's credibility on this front will also be required.

### g. The ALJ Made Multiple Errors in his RFC Determination

As noted, plaintiff finds several faults with the ALJ's RFC determination: (1) that the ALJ failed to provide a "function-by-function" assessment of plaintiff's abilities (Pl.'s Mem. 19-20), (2) that the ALJ failed to address plaintiff's ability to carry, push, or pull (id. at 20), (3) that the ALJ insufficiently grounded his ultimate conclusions in citations to the record (id. at 20-21), and (4) that the ALJ failed to consider both severe and non-severe impairments when determining plaintiff's RFC. (Id. at 19).

Preliminarily, we agree with defendant that the ALJ's failure to provide a "function-by-function" assessment is not a per se failure that warrants remand. (See Def.'s Mem. 22 (citing Cichocki v. Astrue, 729 F.3d 172, 176-77 (2d Cir. 2013)). In Cichocki, the

130

Second Circuit indeed declined to adopt such a <u>per se</u> rule in favor of a requirement that the ALJ "address all relevant limitations." <u>Id.</u> We also note that, contrary to plaintiff's reading of the ALJ's decision, the ALJ did make findings with respect to plaintiff's ability to carry. (<u>Compare</u> Pl.'s Mem. 20 to Tr. 47). Given the ALJ's ultimate conclusion that plaintiff can only perform sedentary work, we also cannot say that a failure to specifically discuss plaintiff's ability to push or pull warrants remand. Nevertheless, remand is necessary given the ALJ's limitation of his RFC assessment to severe impairments alone and what is an ultimately unsubstantiated RFC determination.

First, the SSA must "consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe.'" 20 C.F.R. § 404.1545(a)(2). As already discussed, the ALJ's finding that Mr. Salisbury's mental impairment was non-severe is not supported by substantial evidence. However, even if non-severe, the ALJ must account for limitations arising from that mental impairment when determining plaintiff's RFC. <u>Accord</u> <u>Parker-Grose v. Astrue</u>, 462 F. App'x 16, 18 (2d Cir. 2012) ("A RFC determination must account for limitations imposed by both severe and nonsevere impairments.") (reversing judgment of the district court and remanding to the ALJ "to account for any functional limitations

arising from [the claimant's] depression"); <u>see also Dixon v. Astrue</u>, 2011 WL 4478493, *12 (D.N.J. Sept. 26, 2011) ("[T]he ALJ properly evaluated Plaintiff's depression to determine that it was not severe. However, after making that determination, the ALJ neglected to factor Plaintiff's depression into the RFC analysis, and he failed to offer a reason for leaving Plaintiff's depression out of that analysis.").

Even if we had accepted the ALJ's determination that Mr. Salisbury's depression was not severe -- which, again, we do not -- the ALJ erred by not considering whether and to what degree plaintiff's mental impairments may affect his RFC, however slightly. We note that, in labeling Mr. Salisbury's depression as non-severe, the ALJ stated that "the evidence shows the possibility of only 'mild' deficits in concentration ability which would have had only a very minimal adverse impact on the claimant's ability to perform basic work activities." (Tr. 46). Apart from the fact that this assessment is unsubstantiated -- without citation to the record or further clarification -- it also appears to reflect only the ALJ's impression that Mr. Salisbury's depression was not severe, and the ALJ says nothing about whether some non-severe concentration deficit might affect plaintiff's RFC.

The ALJ's ultimate conclusion on this front is only that "[a]lthough the claimant testified to a history of 'disabling' depression, the documentation relevant to the **period at issue** do[es] not corroborate this assertion." (Id. at 44). None of this implies that the ALJ was denying that plaintiff suffered from any impairment resulting from what the ALJ acknowledges is a "record [that] does show a history of depression." (Id. at 46). Accordingly, on remand -- even if the ALJ reassesses plaintiff's assertion of severe depression and again concludes that the record does not support this characterization -- even depression labeled non-severe must be taken into account in determining the RFC.

Turning to the ALJ's RFC determination about plaintiff's physical abilities, we agree with plaintiff that this determination is not supported by substantial evidence and thus, on this front too, we recommend remand. ALJ Katz's RFC finding is as follows:

> Through the date last insured, the claimant has the residual functional capacity to perform a full range of sedentary exertion level work as defined in 20 C.F.R. 404.1567(a). The claimant had the ability to sit for 8 hours and stand/walk for 4 hours during the course of an 8-hour workday; and he was able to lift/carry items weighing 10 pounds. Despite his back impairments, he is able to bend occasionally (i.e., one-third of the time during a typical work day). The claimant was not able to perform highly aerobic work activity due to his overweight condition.

(Tr. 51) (emphasis added).

133

Defendant points out that the ALJ relied on Dr. Levin's post-accident notes in March and April of 2008 (Def.'s Mem. 17 (citing Tr. 48-49)) and Dr. Hosain's pre-date-last-insured notes from 2008. (Def.'s Mem. 17 (citing Tr. 49-50)). Yet -- except for Dr. Hosain noting that plaintiff reported being unable to sit or stand for more than 10 minutes in any one positon (Tr. 760) -- neither of these doctors opined about plaintiff's ability to sit or stand. (See id. 640-52, 760-818). In fact, contrary to the ALJ's characterizations of these notes as "obviously referable to the patient's ability to perform the 'heavy' exertion requirements of work as a landscaper" (id. at 48), Dr. Levin repeatedly and unqualifiedly wrote that plaintiff was unable to work. (See id. at 648-49, 652).

Defendant claims that "[t]he ALJ also considered Dr. Mehar's October 29, 2008, and undated, post-date last insured assessments (circa 2009)." (Def.'s Mem. 18 (citing Tr. 49-50)). Yet, Dr. Mehar's determination that plaintiff could sit up to six hours per day and stand or walk less than two hours per day (Tr. 845-46) obviously does not match up with the ALJ's ultimate RFC finding.

We also take this opportunity to again address Dr. Polepalle's report, on which the ALJ most significantly relies. She indeed wrote that plaintiff had only "a temporary impairment for

134

approximately two months as a result of the injuries obtained in the March 3, 2008 accident." (Id. at 670). Presumably, then, an RFC based on this report alone would result in a finding of no limitations. Yet -- notwithstanding "the greatest amount of evidentiary weight" afforded to Dr. Polepalle (id. at 50) -- the ALJ explicitly rejects her ultimate conclusion that plaintiff can work as a landscaper and perform housekeeping responsibilities. (See id. at 51). The ALJ determined that, at the very least, plaintiff had shown an inability to return to past work. (Id.). Thus, the ALJ's disability determination turns, in the largest measure, on a startling attempt at having his cake and eating it too, so to speak. In the face of the evidence presented, the ALJ first dismisses Dr. Polepalle's central conclusion: that plaintiff could go back to work. (Id.). Yet, the ALJ also uses this very same conclusion to most substantially support his own conclusion that plaintiff could get another job. (Id. at 51-52).

Bewilderingly, defendant writes that the ALJ relied upon Dr. Polepalle's single examination and report because "her findings and opinion were consistent with the objective evidence." (Def.'s Mem. 18). Nowhere does defendant acknowledge the glaring conflict at the heart of the ALJ's RFC determination, which is also ignored by the ALJ himself. Simply put, in order for the ALJ's RFC determination to even plainly make sense, on remand, he must

135

address this contradiction. To ignore it is quite obviously picking
and choosing of the worst kind.[144]

Hence, it is unclear on what the ALJ based his determinations,
as they contradict those noted by Dr. Mehar, are seemingly not
grounded in the findings of either Drs. Hosain or Levin, are only
vaguely and selectively rooted in Dr. Polepalle's opinions, and
certainly have no testimonial support. This represents yet another
failure, as the ALJ must adequately explain the reasoning
underlying his RFC determination and the basis upon which it rests.

On remand, the Commissioner must develop the record to
demonstrate what evidence supports her RFC determination,
including the impact of plaintiff's exertional and non-exertional
limitations, and she must base her RFC determination on substantial
evidence in the record.

---

[144] There are several other contradictions contained within and relating
to the Polepalle report that -- given its overriding weight in the ALJ's analysis
-- should at least be addressed. First, as mentioned, Dr. Polepalle
contradictorily opined both that plaintiff's impairment was temporary and had
lasted only "approximately two months" and that treatment up to the date of her
report -- about five months after plaintiff's impairment had, according to Dr.
Polepalle, expired -- was "appropriate." (Tr. at 669). Second, Dr. Polepalle's
letter, written for insurance purposes, had seemingly resulted in a denial of
coverage for trigger point injections. (Id. at 750). Yet, in the wake of Dr.
Hosain's November 3, 2008 letter (id.), that denial appears to have been
reversed (see, e.g., id. at 744-45), implying at least a partial rejection of
Dr. Polepalle's report by its ultimate recipient(s). At the very least, this
puzzle reflects that Dr. Hosain -- the other physician afforded great weight -
- disagreed with Dr. Polepalle in some measure.

h. The ALJ Erred in His "Step-Five" Determination

Finally, plaintiff argues that "[t]he ALJ's Step Five finding of disability is not based upon substantial evidence." (Pl.'s Mem. 8). In sum, plaintiff argues that the hypothetical posed to the vocational expert was "incomplete" and based on a "fatally flawed" RFC. (Id. at 23-24).

Although neither plaintiff nor defendant make this point, we note that the ALJ does not appear to have relied exclusively on Mr. Flomberg's testimony. (See Tr. 52). Instead, in light of the determined RFC, the ALJ applied the Grids, finding that Medical-Vocational Rules 201.27 and 201.28 demanded a finding of "not-disabled." (Id.). The ALJ only used Mr. Flomberg's testimony to "buttress[]" the Grids determination (id.), although the interplay between the two is not entirely clear.

Given the significant evidence from East Orange, and other sources, that supports the possibility that plaintiff suffered from non-exertional limitations, exclusive reliance on the Grids is likely inappropriate in this case. In any event, on remand, once the Commissioner has reconsidered the evidence in the record and arrived at an evaluation of plaintiff's RFC encompassing both his physical and his mental impairments, a new vocational

137

determination will be necessary, and the posture vis-à-vis the applicability of the per se Grids rule must be similarly reevaluated.[145]

## CONCLUSION

The ALJ failed in a number of significant ways to fulfill his obligation to evaluate the record and support his finding with substantial evidence. He improperly applied the treating-physician rule, failed to evaluate plaintiff's credibility in accordance with established methods, proffered an RFC determination without support, and -- given these errors -- likely incorrectly employed the Grids and provided ungrounded vocational data.

Accordingly, we conclude that remand is necessary to determine, in accordance with SSA regulations and case law, whether plaintiff qualifies for disability benefits. On remand, the

---

[145] On this final point, it is worth noting that even the ALJ acknowledged the likelihood of plaintiff suffering from some concentration difficulties (Tr. 46), the possibility of that condition being particularly salient in this case. As discussed, plaintiff's attorney questioned Mr. Flomberg about the impact of minor mental limitations on the viability of performing the three proposed jobs. (Id. at 90-91). Plaintiff's counsel then asked whether a person who is "five percent off-task" with respect to focus, thinking and concentrating, emotional availability, and memory would be able to do these jobs. (Id. at 90). Mr. Flomberg answered in the negative. (Id. at 91). Accordingly, even minor, non-severe deficits in these areas -- according to the very vocational expert relied upon by the ALJ -- might have a significant, if not conclusive, impact on plaintiff's ability to work.

Commissioner should develop the record and reconsider the totality of the record as discussed above.

We seriously considered whether an order directing an award of benefits would be justified in this case, given the numerous errors and the many years during which plaintiff has been litigating his case. However, to do so would be to supplant the Commissioner's discretion with our own, and it is conceivable that after the record is more fully developed, defendant may defensibly conclude that plaintiff is not disabled. We nonetheless encourage the Commissioner to act with due haste in evaluating this matter on remand.

For the foregoing reasons, we recommend that plaintiff's motion be granted in part, that defendant's motion be denied, and that the case be remanded to the Commissioner for further proceedings consistent with this opinion. In particular, the Commissioner should make the following corrections of factual and legal errors:

1. Further develop the record by, <u>inter</u> <u>alia</u>, using "every reasonable effort" to seek the needed clarifications from both Drs. Mehar and Rochman.

2. Substantiate or reconsider the discounting of Dr. Mehar's assessment of plaintiff's inability to carry and the off-handed rejection of Dr. Rochman's 2011 report as retrospective.

3. Reassess the evaluation of the various medical sources in light of, <u>inter alia</u>, (1) the length of Dr. Mehar's treatment relationship with plaintiff, (2) the reality that Dr. Polepalle performed only a single examination, (3) Dr. Rochman's professional credentials, (4) the frequency of plaintiff's visits with Dr. Rochman and his treatment notes from 2009 and early 2010, (5) the social worker records from "MEB," (6) the date on which plaintiff initially sought help for his depression from East Orange, and (7) Dr. Hosain's pre-date-last-insured notes regarding the interplay between plaintiff's depression and pain.

4. Ground the assignment of weight to medical sources in good, non-arbitrary reasons and specific citations to the record, especially (1) the weight afforded physicians' opinions of plaintiff's employment prospects, given their collective lack of vocational expertise, (2) the selectively utilized portions of Dr. Polepalle's report, (3) the various findings

140

vis-à-vis the categories of functional mental limitations, and (4) plaintiff's March 2009 "function report."

5. Properly evaluate plaintiff's credibility.

6. Account for even non-severe impairments in the evaluation of plaintiff's RFC.

7. Given this reevaluation, arrive at an updated RFC, which should inform on the appropriateness of reliance on the Grids and a possibly new vocational profile.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Valerie E. Caproni, Room 240, 40 Foley Square, New York, New York, 10007 and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and later on appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health & Human

Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 72, 6(a), 6(d).


DATED:     New York, New York
           September 1, 2015



                      RESPECTFULLY SUBMITTED,

                      _____
                      MICHAEL H. DOLINGER
                      UNITED STATES MAGISTRATE JUDGE




Copies of the foregoing Report & Recommendation have been sent
today to:

**Gary James Gogerty, Esq.**
Drake, Loeb, Heller, Kennedy, Gogerty, Gaba & Rodd, PLLC
555 Hudson Valley Avenue
Suite 100
New Windsor, NY 12553

**Heetano Shamsoondar, Esq.**
Office of The General Counsel
Social Security Administration
26 Federal Plaza, Rm 3904
New York, NY 10278

**John E. Gura, Jr, Esq.**
U.S. Attorney's Office, SDNY (86 Chambers St.)
86 Chambers Street
New York, NY 10007